Filed:  November 1, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 99-6119
(CA-97-2295-PJM)

_____

Brady George Spicer,

                              Petitioner - Appellee,

        versus

Roxbury Correctional Institute, etc., et al,

                              Respondents - Appellants.

_____

O R D E R

_____

     The court amends its opinion filed October 18, 1999, as
follows:

     On page 12, third full paragraph, lines 1-2: the phrase
"Spicer's statement to his attorney" is corrected to begin "<u>Brown</u>'s
statement ...."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                      Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BRADY GEORGE SPICER,
Petitioner-Appellee,

v.

ROXBURY CORRECTIONAL INSTITUTE,
Warden; ATTORNEY GENERAL OF THE
STATE OF MARYLAND,
Respondents-Appellants.

No. 99-6119

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-97-2295-PJM)

Argued: June 8, 1999

Decided: October 18, 1999

Before WILKINSON, Chief Judge, and NIEMEYER and KING,
Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Niemeyer wrote the opinion, in which Chief Judge Wilkinson joined.
Judge King wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Ann Norman Bosse, Assistant Attorney General, Crimi-
nal Appeals Division, OFFICE OF THE ATTORNEY GENERAL,
Baltimore, Maryland, for Appellants. Nancy Maggitti Cohen,

COHEN & MCCABLE, L.L.C., Annapolis, Maryland, for Appellee.
**ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland,
Criminal Appeals Division, OFFICE OF THE ATTORNEY GEN-
ERAL, Baltimore, Maryland, for Appellants.

_____

**OPINION**

NIEMEYER, Circuit Judge:

The grave question over the fairness and accuracy of the trial that
the State of Maryland provided to Brady George Spicer on charges
that he brutally assaulted Francis Denvir arises from the state's viola-
tion of Spicer's due process rights under Brady v. Maryland, 373 U.S.
83 (1963). To correct the fatal flaw and to assure that Spicer receives
a fair trial, we affirm the district court's order granting Spicer's peti-
tion for the writ of habeas corpus under 28 U.S.C. § 2254 and direct-
ing the state either to retry Spicer within four months or to release
him unconditionally from custody.

I

Shortly before noon on February 22, 1990, an assailant approached
Francis Denvir from behind, while he was seated at his desk, and
struck him on the back side of his head and the side of his face,
knocking him unconscious. The assailant then continued to beat Den-
vir savagely in the head and face, leaving him seriously and perma-
nently injured.

Denvir was the manager and part-owner of a popular bar and res-
taurant in downtown Annapolis, Maryland, known as Armadillo's. At
the time of his assault, Denvir was in a small office upstairs from the
bar, signing payroll checks. Between $1,500 and $2,000 in cash,
banded in stacks, lay on Denvir's desk and remained there after the
assault. Denvir neither saw nor heard the assailant enter his office
because he had his back to the door and he was listening to audition
tapes through headphones.

As the assault was taking place, Henry Connick, an Armadillo's
bartender, heard 10 to 15 thumps, which he described as a "methodi-

2

cal banging," and went upstairs to investigate. When he entered the office, he saw Denvir on the floor and the assailant standing over Denvir, with a liquor bottle in his right hand. Connick ran back down the stairs and out the door of the bar, and the assailant followed, dropping the liquor bottle at the foot of the stairs. When the assailant ran out the door past Connick, Connick chased the fleet-footed assailant for several blocks before giving up and returning to the bar.

Sam Novella, who was cutting tile in an alley near Armadillo's, saw the chase and obtained "a very quick view" of "a black gentlemen running very fast and an employee of Armadillo's chasing him."

This violent, midday crime at a popular bar in the heart of Annapolis garnered significant media attention. The Annapolis Police did not believe that robbery was the motive for the crime because the money on Denvir's desk remained untouched and the assailant had continued to attack Denvir even after rendering him unconscious. Moreover, Denvir received hang-up calls at his home after the attack and was reluctant to talk to police about the incident. Some police officers were left with the impression that Denvir knew more than he was willing to tell. While the police pursued many leads and investigated a number of suspects, the assault remained unsolved for over six months, and the investigation was placed on a "suspended" status.

In September 1990, Larry Brown, who had been arrested on three counts of distributing cocaine, first introduced Brady George Spicer's name in connection with the Armadillo's assault in his efforts to plea bargain with prosecutors. Brown's lawyer, Gary Christopher, a public defender, asked Brown if he had any information to assist prosecutors. As Christopher later recounted, he "made clear to [Brown that] it was very important to . . . present as much evidence as we could to the State in order to interest them in working out a deal." To this end, Christopher told Brown that he did not want all of the details, but he did need "the major things."

Brown told Christopher that a few days before the assault, an individual, whom he knew as "Spicy," asked him questions about Armadillo's, such as whether or not they were hiring and what he knew about a man who counts money upstairs in the morning. Those questions made Brown suspicious that "Spicy" was planning a robbery.

3

Brown stated that the next time he saw "Spicy" was a day or two after the Armadillo's assault and that "Spicy" had made some expression of thanks, presumably for not disclosing their prior conversation.

Believing that this information that Brown related would be insufficient to induce the state prosecutor to bargain, Christopher "pressed [Brown] for any further information he might have as to whether . . . he saw Spicy the day of the offense or whether he could connect him any more closely to the offense and he could not." When Brown specifically denied seeing "Spicy" the day of the assault, Christopher further "pressed him" on that because, as Christopher later related, "I was concerned, what he told me was not enough to go to the Grand Jury with. . . . [I]t would be very much to[his] benefit if [he] knew any other detail that could help -- that could make the package more attractive, as it were." Brown nevertheless maintained that he had <u>not</u> seen "Spicy" on the day of the assault.

With that information, Christopher contacted Steve Sindler, the prosecutor on Brown's drug charges, and related the information that Brown had told him. Eventually, Brown pled guilty and agreed to testify against Spicer in exchange for a suspended sentence. When prosecutor Sindler interviewed Brown without Christopher present, Brown stated, for the first time, that he had seen Spicer running from the crime scene on the day of the assault. Brown also testified before the grand jury that he had witnessed Spicer's flight from Armadillo's. Sindler recognized the discrepancy between Brown's testimony and his account to Christopher but "didn't think anything of it." He explained that he preferred to rely on what Brown told him directly rather than what Brown's attorney had earlier related about Brown's original version of the events.

In October 1991, Spicer was charged with assault with intent to murder and other lesser offenses arising out of the attack on Denvir at Armadillo's. At the time, Spicer was serving a one-year sentence for an unrelated theft. In an interview with David Cordell, the investigator for the Anne Arundel County State's Attorney's Office, Spicer denied any involvement and requested a polygraph test, which he was not given. In addition, he told Cordell, as well as his own attorney, that he had shattered his kneecap approximately 18 months prior to the Armadillo's incident and, following an operation, was unable to

4

run -- unlike the assailant described by Connick and Novella. Spicer even showed Cordell a scar from the operation. Spicer's attorney obtained the medical records confirming an operation to repair a fractured patella during the indicated time frame, although this information was not presented to the jury.

On May 14, 1992, 12 days after being released from the theft sentence, Spicer appeared in court of his own accord-- no detainer had been issued -- believing that the Armadillo's charges were a matter of mistaken identity. At his trial, the prosecution introduced no physical evidence linking Spicer to the Armadillo's assault. The prosecution's case relied exclusively on testimony from three purported eyewitnesses: Henry Connick, the Armadillo's bartender; Sam Novella, the man who had been installing tile near Armadillo's; and Larry Brown.

Connick, the bartender, made a courtroom identification of Spicer, who, Spicer's attorney observed, was the only African-American male in the courtroom other than a deputy. Connick stated that "[h]e doesn't look exactly the same today as he did then. He's heavier now. . . . He looks different than his pictures, here. You can see he's changed. He looks considerably different, now. But I'm positive that's him." Cross-examination revealed that within hours of the Armadillo's incident, Connick had described the perpetrator to the police as a black male, 5'9" tall, weighing 165 pounds. Spicer is 6'4" tall and weighs over 200 pounds. Connick also testified that, during the course of the investigation, he had identified several other individuals in five photo arrays as "not positive, but could be," intending to convey that those individuals looked the most like the perpetrator. In January 1991, Connick selected Spicer's photograph from another array, stating that "number three has the same complexion, same facial features, and [he] is almost positive that number three is the person that he chased out of Armadillo's office."

Sam Novella was the prosecution's next eyewitness. Defense counsel had sought to suppress any pretrial photo-identifications that Novella and Connick had made. But when the prosecution advised the court at the suppression hearing that it was unable to locate Novella and did not plan to use him as a witness at trial, the court proceeded with the suppression hearing without Novella's presence and denied

5

the motion. The state, as it turned out, did produce Novella at trial, and Novella testified without objection from defense counsel. Novella related that he had been installing ceramic tile at a nearby restaurant when he saw "a black gentleman running very fast and an employee of Armadillo's chasing him." When asked if he saw the perpetrator in the courtroom, Novella stated, "Well, it has been a long time, but he [Spicer] looks very, very familiar. I can say that." Novella's testimony revealed that when shown a photo array with Spicer's picture prior to trial, he claimed that all six photographs closely resembled the person he had seen running and that although Spicer's photograph was the closest one, "the skin tone wasn't right."

Larry Brown was the final eyewitness for the prosecution. He testified that he had been working at the fish market in downtown Annapolis on the day of the crime and that he had seen Spicer run past, followed by Connick. He also testified that upon seeing Spicer several days after the incident, he told Spicer that the police were trying to make him testify against Spicer. According to Brown, Spicer responded, "Don't even feed into that." In response to a question from the prosecution, Brown also testified that his testimony in court was the same as what he originally had told his attorney prior to the plea bargain. During cross-examination, Brown stated that he had known Spicer for two years before the Armadillo's incident, but then, when questioned more closely, he acknowledged that his grand jury testimony correctly stated that he had known Spicer for only two weeks. Brown also testified repeatedly that the incident occurred on February 2, 1990, 20 days earlier than it actually occurred.

After the close of evidence and during deliberations, the jury sent out a note which read: "The victim testified he was hit in the right rear of the head with the first blow. Is the defendant righthanded or lefthanded. During the trial he has been taking notes lefthanded." The court responded, "I can't answer that. All of the evidence is in that was to be presented by counsel and therefore, I can't answer the question for you." The jury convicted Spicer on all counts except for the robbery and attempted robbery counts, which the trial judge had dismissed earlier for lack of evidence.

After the verdict, several Annapolis City police officers who had investigated the case, as well as David Cordell, the State's Attorney's

investigator who had interviewed both Brown and Spicer, met with Frank Weathersbee, the State's Attorney for Anne Arundel County to express their concerns that Spicer had been wrongfully convicted.

Also, after the verdict but before Spicer's sentencing, Gary Christopher, Larry Brown's attorney, learned through newspaper reports that Brown had testified to having witnessed Spicer running away from the crime scene. Knowing that he had conveyed Brown's denial of having been an eyewitness on the day of the assault to prosecutor Sindler, Christopher believed that Sindler's failure to disclose that information to Spicer's counsel was a Brady[1] problem because it prevented Spicer from impeaching Brown with a prior inconsistent statement. Christopher therefore contacted Spicer's counsel and offered to testify on Spicer's behalf on a motion for a new trial or at a post-conviction hearing.

On July 9, 1992, the trial court conducted a hearing on Spicer's motion for a new trial based on Christopher's testimony that Brown originally had denied being an eyewitness. Spicer also sought a two-week continuance to investigate information from a fellow inmate who claimed to have heard Brown boasting that he had lied on the witness stand about seeing Spicer on the day of the Armadillo's incident in order to reduce his own sentence.[2] The trial court denied both motions.

The court then conducted the sentencing hearing. During allocution Spicer vigorously protested his innocence as he had done consistently since being charged with the assault:

> Never in my wildest dreams would I believe that my life would be destroyed this way, on a miscarriage of justice. I had no knowledge of this crime, yet I'm here today with my

---

[1] In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that a state denies a defendant due process by failing to disclose to the defendant before trial evidence favorable to the defendant that is material either to guilt or to punishment.

[2] At oral argument, counsel for Spicer advised the court that Brown has since recanted his trial testimony that he was an eyewitness to Spicer's flight from Armadillo's.

7

life on the line as well as my family's. . . . I had no reason to attack Mr. [Denvir]. And I truly feel sorry for him and his family. But I feel even more sorry if they find happiness in seeing an innocent man being sent to jail.

\* \* \*

I'm still in shock behind this whole situation because, you know, I know I'm innocent. I know I didn't commit this crime, and I never thought that I would be one of the statistics that would have to be -- to be -- have to come before you and serve time for something that -- for a crime that I didn't commit.

\* \* \*

I pleaded guilty to every charge I've ever had in my life. I always pleaded guilty if it was something that I did. You've got my record right there. Always pleaded guilty because that's the only way I know I could get a fair deal. Now I'm getting a raw deal and I'm innocent. . . . (Defendant crying).

After hearing his statement, the court said to Spicer, "I keep telling you, Mr. Spicer, that I personally did not find you guilty. A jury of your peers found you guilty. They had the evidence." Because of the gravity of harm to Denvir, the trial judge noted that "this case does cry out for the maximum sentence." The court thereupon sentenced Spicer to 30 years imprisonment, 10 years more than the maximum suggested guideline. The Maryland Court of Special Appeals affirmed the judgment, and the Maryland Court of Appeals declined further review.

Spicer then commenced state post-conviction proceedings, alleging prosecutorial misconduct, Brady violations, and ineffective assistance of counsel. At the hearing on his motions, both Christopher and Sindler testified concerning the prosecution's failure to inform Spicer's counsel that Brown's statements to the prosecutor and to the grand jury did not match the account he had given Christopher, which

8

Christopher had conveyed to the prosecutor. Christopher testified, as he had done at the hearing on the motion for a new trial, that Brown had denied having been an eyewitness to Spicer's flight on the day of the assault and that Christopher had recounted that information to Sindler. Sindler corroborated Christopher's testimony and stated that he "recognized that what Mr. Christopher told me wasn't what Mr. Brown had told me, but I didn't think anything of it, because I didn't really pay much attention to what Mr. Christopher told me."

The state court denied Spicer's bid for post-conviction relief. On the Brady claim, the court concluded that it was "not persuaded that there was a Brady violation." Even though the court acknowledged that "impeachment evidence may be considered Brady material," it observed that "the Court of Special Appeals has advised that `[g]enerally speaking, [materiality] requires that the evidence be directly exculpatory and not of mere utility for impeachment purposes,'" quoting Icgoren v. State, 653 A.2d 972, 993 (Md. App. 1995). The court found that Brown's statements to the state were not inconsistent and that "neither Brady nor the line of cases following Brady required the State to inform defense counsel of a potential discrepancy between what Brown's attorney indicated Brown knew and what Brown actually told the Prosecutor."[3] As to the ineffective assistance of counsel claim predicated on numerous alleged deficiencies, the court concluded that Spicer had failed to establish prejudice. The Court of Special Appeals denied the application for review of the trial court's ruling on these issues.

_____

[3] The state court's entire ruling on the Brady issue relating to withholding Brown's statement is as follows:

> While impeachment evidence may be considered Brady material, the Court of Special Appeals has advised that "[g]enerally speaking, [materiality] requires that the evidence be directly exculpatory and not of mere utility for impeachment purposes." Icgoren v. State, 103 Md. App. 407, 451, 653 A.2d 972 (1995). The Court finds that Brown never made any inconsistent statement to the State regarding his being an eyewitness to the chase and concludes that neither Brady nor the line of cases following Brady required the State to inform defense counsel of a potential discrepancy between what Brown's attorney indicated Brown knew and what Brown actually told the prosecutor.

9

Spicer filed this petition for habeas relief on July 16, 1997. The district court granted the petition, concluding that the state court had unreasonably applied Brady and its progeny and that trial counsel's decision not to object to Novella's testimony constituted ineffective assistance of counsel. The State of Maryland filed this appeal.

II

The State of Maryland contends that the district court erred in concluding that the state court unreasonably applied Brady, see 28 U.S.C. § 2254(d), and in refusing to accord a presumption of correctness to factual findings purportedly made by the state court on the Brady issue, see 28 U.S.C. § 2254(e)(1). It argues that Brady was not implicated because the state post-conviction court found that only a "potential" discrepancy existed between Brown's statements to his attorney and his statements to prosecutors. The state also contends that the district court erred in finding that the withheld evidence in this case was material, arguing instead that it was "of scant impeachment value."

We review de novo a district court's decision on a petition for writ of habeas corpus based on a state court record, applying the same standard of review that governed the district court on habeas review under 28 U.S.C. § 2254(d). That provision provides that a federal court must not issue the writ with respect to any claim that

> was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

10

Clearly established federal law, determined in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny, provides that a state violates a defendant's due process rights when it fails to disclose to the defendant prior to trial, "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87. The <u>Brady</u> rule is not intended to "displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985) (footnote omitted). This limited departure from the adversary system "illustrates the special role played by the American prosecutor in the search for truth in criminal trials." <u>Strickler v. Greene</u>, 119 S. Ct. 1936, 1948 (1999). The prosecutor's unique role "transcends that of an adversary: [the prosecutor] `is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" <u>Bagley</u>, 473 U.S. at 675 n.6 (quoting <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935)); <u>see also Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) (noting that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). At the same time, <u>Brady</u> does <u>not</u> create a full-scale, constitutionally-mandated discovery right for criminal defendants. Such a rule would impose an oppressively heavy burden on prosecutors and would drastically undermine the finality of judgments. <u>See</u>, <u>e.g.</u>, <u>Kyles</u>, 514 U.S. at 437; <u>Bagley</u>, 473 U.S. at 675 n.7.

Thus, while the prosecutor's "special status" embraces a "broad duty of disclosure," it also entails the "conclusion that not every violation of that duty necessarily establishes that the outcome was unjust." <u>Strickler</u>, 119 S. Ct. at 1948. Three "essential components" of a <u>Brady</u> violation circumscribe the duty: (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material. <u>Id.</u>

Our task is to determine, within this framework, whether the prosecution in Spicer's case violated <u>Brady</u> when it failed to disclose to Spicer's attorney information that Brown -- who told the prosecutor, the grand jury, and the trial jury that he witnessed Spicer fleeing

11

Armadillo's on the day of the assault -- had previously told his attorney on multiple occasions that he had not seen Spicer at all on that day.

A

Brown's prior inconsistent statement about whether he was an eyewitness clearly satisfies the first requirement of a Brady violation -- that the evidence be "favorable" to the defendant. Evidence that can be used to impeach a witness is unquestionably subject to disclosure under Brady. See Strickler, 119 S. Ct. at 1948 (explaining that "the duty [imposed by Brady] encompasses impeachment evidence"); Bagley, 473 U.S. at 676 (holding that impeachment evidence "falls within the Brady rule"); Giglio v. United States, 405 U.S. 150, 154 (1972). In fact, the Court has recognized that "if disclosed and used effectively, [impeachment evidence] may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676.

In denying Spicer's Brady claim on post-conviction review, the state court apparently misunderstood the scope of Brady, failing to appreciate that impeachment evidence is unequivocally subject to disclosure. The state court only recognized that impeachment evidence "may be considered Brady material" because the Maryland Court of Special Appeals had concluded that under Brady the materiality component generally required evidence to "be directly exculpatory and not of mere utility for impeachment purposes" (quoting Icgoren, 653 A.2d at 993) (emphasis added). This conclusion is contrary to clearly established federal law to the extent that it fails to recognize unequivocally that impeachment evidence falls within the parameters of Brady and therefore must be disclosed if material. See 28 U.S.C. § 2254(d)(1).

Moreover, the state court failed to appreciate that Brown's statement to his attorney, specifically, was impeachment evidence and therefore potential Brady material. The court took care to point out that Brown's statements to the state -- i.e. to the State's Attorney, the grand jury, and to a jury at trial -- were consistent and therefore could provide no basis for impeachment. However, the court failed to recognize the significance of the inconsistency between Brown's statements to the state and his earlier contrary statements to his attor-

12

ney. Characterizing this inconsistency as only a "potential discrepancy," the trial court improperly discounted its relevance in impeaching Brown.

By portraying this difference between Brown's statements to his attorney and his statements to the prosecutor as merely a "potential discrepancy," the state court failed to recognize the impeachment value of the statements to Brown's attorney. The state court appears to have determined that these statements were not of impeachment character because they had not been made directly by Brown to the state. However, the impeaching nature of the statements does not depend on whether the state was a direct or indirect audience. For purposes of determining whether evidence is "favorable" to the defendant, it is the content of the statements, not their mode of communication to the state, that is important. The state court appears improperly to have incorporated an evidentiary or ripeness requirement into the relatively straightforward determination of whether evidence can be used to impeach a witness and is therefore "favorable" under Brady.

The impeachment quality of the evidence is clear. Over the course of half a dozen meetings between Brown and his attorney, Christopher, during which Christopher emphasized "the need to present as much evidence as we could to the State in order to interest them in working out a deal," Brown consistently told Christopher that he had seen "Spicy" a few days before the assault and a few days after the assault, but not on the day of the assault. In fact, Christopher testified that he had "pressed" Brown on this point, advising him that "it would be very much to [his] benefit if [he] knew any other detail . . . that could make the package more attractive." Even then, Brown insisted that he had not seen Spicer on the day of the assault.

After some preliminary negotiations, Christopher conveyed to Sindler what Brown had told him about Brown's contacts with Spicer in the days before and after, but not the day of, the Armadillo's incident. When Sindler interviewed Brown outside the presence of his attorney, however, Brown, for the first time, claimed to have seen Spicer being chased by another man as he ran from Armadillo's on the day in question.

Sindler confirmed Christopher's statement that Brown's story had changed from what Christopher had related to the prosecutor to what

13

Brown told the prosecutor directly, and Sindler also acknowledged that he "recognized that what Mr. Christopher told me wasn't what Mr. Brown had told me." In fact, he specifically "recall[ed] at the time knowing that there was the part about [Spicer] running away from Armadillos [that] was not said by Gary Christopher to me. Then I know that when I met with Larry Brown, he said that." In short, Christopher's and Sindler's compatible recollections confirm the inconsistency between the different versions of events offered by Brown.

The discrepancy between Brown's testimony in court and his prior statements to his attorney would have provided Spicer with significant impeachment material aimed at the very heart of Brown's testimony -- that he had been an eyewitness who could identify Spicer at the scene. The impeachment value of this information increases, as we discuss further in Part II(C), because, of all the purported eyewitnesses, only Brown knew Spicer; the other witnesses had never seen him before and had difficulty identifying him.

Accordingly, the fact that Brown told at least two different versions of what he did or did not see on the day of the assault, coupled with the significance of the distinction -- whether or not Brown was an eyewitness -- demonstrates that this information, if disclosed to the defense in Spicer's trial, could have been used to impeach Brown. As impeachment evidence, it was subject to disclosure under Brady and its progeny if it was material.

B

The second element of Brady requires us to determine whether the prosecution suppressed this impeaching evidence, irrespective of whether the suppression was willful or inadvertent. Suppressed evidence is "information which had been known to the prosecution but unknown to the defense." United States v. Agurs, 427 U.S. 97, 103 (1976).

There is no question that in this case the prosecution never informed Spicer's counsel that Brown's version of Spicer's involvement in the Armadillo's incident had changed. The state acknowledges that its prosecutor recognized that Brown's earlier statements

to his attorney did not correspond to what Brown told prosecutors directly and that its prosecutors did not provide that information to Spicer's counsel before trial. The prosecutor's actions appear to have been based on a misunderstanding of his disclosure obligation under <u>Brady</u>. But this misunderstanding, or even his error in judgment about it, cannot justify releasing the prosecutor from the obligation. <u>See</u> <u>Kyles</u>, 514 U.S. at 438-39.

State prosecutor Sindler recognized that what Brown had told him personally did not match what Brown's attorney had related to him earlier: Brown told the prosecutor directly that he <u>was</u> an eyewitness to Spicer's flight from Armadillo's, yet Brown told his own attorney that he was <u>not</u> an eyewitness, a fact that the attorney conveyed to the prosecutor. Sindler admitted that he "recognized that what Mr. Christopher told me wasn't what Mr. Brown had told me." He also acknowledged more specifically that he

> recall[ed] at the time knowing that there was the part about [Spicer] running away from Armadillo's [that] was not said by Gary Christopher to me. Then I know that when I met with Larry Brown, he said that. It didn't really impress me favorably or unfavorably, because I didn't think what Gary had said to me was really what I would take any action upon.

Thus, the record shows clearly that the prosecutor was aware of both Brown's first version of the events and the fact that that version did not square with Brown's later claim to have been an eyewitness to the chase.

The explanation for the state's failure to produce this information about the inconsistent statement to Spicer's attorney appears to be that prosecutor Sindler was concentrating on the quality of evidence he needed for the grand jury and for trial and not on his <u>Brady</u> obligation. This oversight is revealed in his testimony as follows:

> Q. And why didn't you really pay much attention to what Mr. Christopher told you [i.e. Brown's inconsistent statement]?

15

A. Because I knew that before I would act upon anything that a snitch would tell me, that I would speak to the person and know first hand. Generally -- I mean, often times it is the case that they -- a person will-- an attorney will say that their client has information.

As a prosecutor you -- if you are going to base your case on a person testifying -- you would talk to that person firsthand.

This testimony indicates that Sindler did not focus on Christopher's statement as to what Brown had said concerning the Armadillo's incident as potential Brady material, despite the fact that he recognized that Brown's claim to have been an eyewitness was "not" what Christopher had told him Brown had said. The prosecutor, although conscious of the distinction, was indifferent to it because he was skeptical of the reliability of Brown's attorney's version and therefore discounted it for his own prosecutorial purposes in preparing to seek an indictment. This course of action is clearly logical and proper in carrying out the adversarial part of the prosecutor's responsibilities. But it neglects the independent prosecutorial duty under Brady to evaluate information the prosecution receives to determine whether it is exculpatory and material and therefore subject to mandatory disclosure.

We emphasize, however, that we do not hold that the prosecutor is obligated under Brady to seek out or to uncover inconsistencies in the versions of events that a witness presents to his own attorney in preparation for plea negotiations. The prosecution cannot be responsible for producing exculpatory material that flows in private discussions from a witness to his attorney. Nor do we hold that the prosecutor is obligated to disclose potentially exculpatory material contained in the back-and-forth hypothesizing that commonly occurs during plea negotiations between the prosecution and defense attorneys. But when the prosecutor receives information that he, as an objectively reasonable prosecutor, should recognize as exculpatory or of impeachment value, he is under a duty to disclose it to the defendant if it is material.

Our conclusion that the state withheld Brady material in this case also is not intended to suggest any bad faith on the part of the prosecutor. On the contrary, the record discloses no such evidence. But the

16

Brady requirement applies regardless of the prosecutor's motives or good faith. See Brady, 373 U.S. at 87. As the Supreme Court has stated, "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." Agurs, 427 U.S. at 110. Thus, even when the prosecutor's actions in suppressing exculpatory evidence are in flagrant bad faith, if the evidence at issue is not material, no Brady violation has occurred. See Brown v. French, 147 F.3d 307, 312-13 (4th Cir. 1998). Conversely, where, as here, the prosecution has acted in good faith but simply misunderstood the scope of its Brady obligation, constitutional error has occurred if the exculpatory evidence at issue is material.

C

Materiality is the final limitation that circumscribes the prosecutor's duty under Brady to disclose information favorable to the defense. The touchstone of materiality is a "concern that the suppressed evidence might have affected the outcome of the trial." Agurs, 427 U.S. at 104. Accordingly, an individual alleging a Brady violation must demonstrate that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Although this analysis can entail an examination of the nature and strength of the prosecution's case, the materiality test is not an evaluation of the sufficiency of the non-suppressed evidence, nor does it require the defendant to prove, by a preponderance of the evidence, that he would have been acquitted if the suppressed evidence had been disclosed. See Kyles, 514 U.S. at 434-35. As the Supreme Court recently reiterated,

> the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

Strickler, 119 S. Ct. at 1952 (quoting Kyles, 514 U.S. at 434). Accordingly, even though the evidence at issue was "favorable" to Spicer

17

because it could have been used to impeach one of the government's witnesses and even though the prosecutor possessed the information, the prosecutor would only be required to disclose it under Brady if it was "material," such that prejudice ensued from its suppression. See Strickler, 119 S. Ct. at 1948.

The state post-conviction court appears to have concluded that the evidence at issue was not material. After citing the "reasonable probability" materiality standard from Bagley, the state court asserted that:

> While impeachment evidence may be considered Brady material, the Court of Special Appeals has advised that "[g]enerally speaking, [materiality] requires that the evidence be directly exculpatory and not of mere utility for impeachment purposes." Icgoren v. State, 103 Md. App. 407, 451, 653 A.2d 972 (1995).

This statement of law flatly contradicts clearly established federal law which rejects a distinction between impeachment evidence and directly exculpatory evidence for Brady purposes and holds that impeachment material is subject to Brady disclosure. See Strickler, 119 S. Ct. at 1948; Bagley, 473 U.S. at 676; Giglio, 405 U.S. at 154-55. The state court's presumption that it would be more difficult to demonstrate materiality with impeachment evidence is at odds with this body of precedent. Further, it undermines the reasonableness of the court's final determination that the evidence was not material. Thus, the state court's decision involved "an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In its brief, the state maintains that the evidence withheld was not material:

> The difference between Mr. Christopher's proffer and Brown's testimony was of scant impeachment value, because, so far as the record suggests, it could have been attributable to some decision or lapse by Mr. Christopher. Viewed thusly, and viewed in the light of the other vulnerabilities in Brown's testimony that did come to light in the

18

> jury's presence, any inconsistency was not reasonably likely
> to have affected the jury's verdict.

In addressing this argument, we recognize that the materiality inquiry is a context-specific determination. See United States v. Ellis, 121 F.3d 908, 918 (4th Cir. 1997) (explaining that to determine whether evidence is material for purposes of Brady, "we evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial"). As a result of this approach, the same evidence could be material in one setting and immaterial in another. In this case, we agree with the district court's determination that the impeachment evidence suppressed by the prosecution was material.

At Spicer's trial, the prosecution presented no physical evidence linking Spicer to the crime. Compare Strickler, 119 S. Ct. at 1954 (noting, in finding impeachment evidence immaterial, that "there was considerable forensic and other physical evidence linking petitioner to the crime" (footnote omitted)), and Brown, 147 F.3d at 312 (concluding that allegedly exculpatory evidence was immaterial given the "overwhelming physical evidence" including petitioner's "ring found underneath the victim's liver"). Indeed, Spicer's name was not even linked to the crime until over six months after it was committed, and then only when Brown suggested that Spicer might be involved. Spicer's conviction rested entirely on the vulnerable identification testimony of three witnesses: Brown, Novella, and Connick. If Brown in fact was not an eyewitness -- a position that he took with his attorney prior to plea negotiations and that he has now taken again according to Spicer's counsel at oral argument -- and given that Novella admittedly could not identify Spicer except to say he looked "very, very familiar," then the prosecution would be left with only the identification evidence of Connick to implicate Spicer.

Connick's evidence could well suggest that he identified the wrong person. On the day of the assault, Connick described the assailant as 5'9" tall, weighing 165 pounds. In fact, Spicer is 6'4" tall and weighs over 200 pounds. At trial, Connick testified that the assailant held the assault weapon in his right hand (consistent with blows to the victim's head struck from behind on the right side). In a note to the court, however, the jury observed that Spicer wrote with his left hand. Finally,

19

Connick testified that the assailant ran away very fast, too fast for Connick to catch over a period of several blocks. In fact, Spicer had had a crushed kneecap and an operation that precluded him from running fast. In addition to these objective discrepancies in Connick's identification of Spicer, Connick also had difficulty in picking Spicer out of a photo array.

It is not our role to function as a jury. But to assess whether Brown's prior inconsistent statement was material, we must examine it in light of the other evidence presented to the jury. See Ellis, 121 F.3d at 918. Thus, we identify the inconsistencies in Connick's testimony and the equivocation in Novella's testimony only to provide the context in which the jury heard Brown testify that he saw his acquaintance Spicer flee the scene of Armadillo's. We conclude that in this context, the withheld evidence was material. Indeed, Brown's testimony about being an eyewitness to Spicer's flight might have been critical because he knew Spicer and could correctly identify him. If the jury doubted that Brown was an eyewitness, it would be left without any conclusive, or perhaps even persuasive, identification evidence.

The state argues that the evidence to impeach Brown is not material because Brown had already been impeached with evidence of his prior convictions, as well as the extremely favorable terms of his plea agreement, so that any additional impeachment evidence would be of marginal value. But this argument ignores the salience of the subject matter of the impeachment -- whether or not Brown was an eyewitness at all. Impeachment with a prior inconsistent statement relating to the central issue that the jury was required to decide is a far more serious blow to the prosecution's case than simply pointing out the common situation that Brown's testimony resulted from a plea bargain.

The state also argues that because the jury was already exposed to the weaknesses in the government's case, Spicer cannot demonstrate that there was a "reasonable probability" of a different outcome. Maryland's argument rests on a misconception of the materiality standard. As we have previously held, "Kyles explains what is not required in demonstrating materiality -- a defendant does not have to show by a preponderance of the evidence that disclosure of the evi-

20

dence would have resulted in acquittal." Ellis, 121 F.3d at 915-16 (citing Kyles, 514 U.S. at 431-32, and Hayes v. Alabama, 85 F.3d 1492, 1498 (11th Cir. 1997) (interpreting Kyles to mean that undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence will still convict)). Stated differently, Spicer need not prove that if he had been able to impeach Brown with the suppressed testimony, the jury would have acquitted him. The test for materiality is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 at 434.

Withheld, "favorable" evidence of the kind identified in this case, in a context where the undisclosed material could have been used to render the evidence of guilt ambiguous has a more significant impact than where the evidence of guilt is otherwise ample. In this case, that significant impact requires us to conclude that Spicer did not receive a fair trial resulting in a verdict "worthy of confidence."

To allay the concern of our dissenting colleague that prosecutors might be unduly burdened with any Brady duty arising from the routine and casual discussions of plea-bargaining, we wish to emphasize the limited scope of our holding and the peculiar facts to which it applies. Brown gave a statement to his attorney (for presentation to the prosecutor) that, while he could implicate Spicer, he was not an eyewitness to Spicer's presence on the day of the assault, and later he stated to the prosecutor that he was an eyewitness. The prosecutor acknowledged that at the time he recognized the inconsistency of these statements and that he did not tell Spicer's attorney about them. Because his explanation for his actions and the state court's ruling on them failed to accommodate the requirements of Brady, the application of Brady in this case does not arise from ambiguous facts but from the state's misconception of its Brady duty.

III

We address briefly the district court's alternative basis for granting the writ of habeas corpus. The district court concluded that Spicer's trial counsel was constitutionally ineffective for failing to object to the testimony of Novella, the government's second eyewitness, who

21

had seen the perpetrator run past him as he was installing tile near Armadillo's. The district court found that Spicer had established both deficiency of counsel's performance and prejudice, as required by Strickland v. Washington, 466 U.S. 668 (1984).

Before trial, Spicer's counsel filed a motion in limine to suppress photo identification evidence from both Novella and Connick. Even though Novella failed to appear at the suppression hearing, leading the prosecutor to tell the court that he did not intend to call Novella at trial, Novella later appeared and was in fact called as a witness at trial without objection from Spicer's attorney. Moreover, Spicer's attorney did not object when Novella testified that Spicer looked "very, very familiar." The state post-conviction court found that Spicer's counsel's decisions not to object to Novella's testifying and to his testimony "could constitute sound trial strategy, falling within the wide range of professionally competent assistance."

Our evaluation of trial counsel's performance is "highly deferential." Wilson v. Greene, 155 F.3d 396, 403 (4th Cir.) (citing Strickland, 466 U.S. at 689, and Truesdale v. Moore, 142 F.3d 749 (4th Cir. 1998)), cert. denied, 119 S. Ct. 536 (1998). While Novella's inability to pick Spicer out of a photo array before trial and his surprise appearance at trial might have invited objections to his testifying and to his testimony, an alternative trial strategy was nevertheless available. Electing not to object to a witness based on what the witness is expected to say could have facilitated an effective offensive strategy for the defense. Spicer's attorney might reasonably have believed that, given the flimsiness of Novella's identification, cross-examining Novella would be more devastating to the government than excluding his testimony. We believe that Spicer simply has not "overcome the presumption that the challenged action may be considered an appropriate and necessary trial strategy under the circumstances." Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995) (citing Strickland, 466 U.S. at 689).

In addition, the record reveals no reason to conclude that the trial judge would have granted a motion to exclude Novella as a witness or to preclude his answer that Spicer appeared "very, very familiar" if objections had been made. The trial court had already refused to suppress evidence relating to the pretrial identification by Connick,

22

and there was little reason to believe that objections challenging Novella's identification were more likely to succeed.

Accordingly, we reverse this additional ground relied on by the district court in support of its writ.

IV

In summary, we affirm the district court's decision to grant the writ of habeas corpus to Brady George Spicer on the ground that the prosecution suppressed exculpatory, material evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and we affirm the district court's order that Spicer be released from custody unconditionally unless he is retried within four months. We reverse the district court to the extent that the issuance of the writ is premised upon a finding of unconstitutionally ineffective assistance of counsel. Accordingly, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

KING, Circuit Judge, dissenting:

With all respect for my colleagues in the majority, I cannot concur in their conclusion that a Brady violation occurred in this case. To be sure, the facts portrayed by the majority regarding the conviction of Brady George Spicer for the brutal beating and attempted murder of Francis Denvir suggest troubling questions that strike at the heart of our criminal justice system. Our system, however, has been and remains the best ever devised for ferreting out and punishing the guilty, while vindicating the innocent.

In its pursuit of the guilty, the government often enlists the assistance of brigands and blackguards to ensure that the worst among them receive their just desserts. Time and again we have acknowledged the risk that inheres in harboring our hopes for a true and honorable adjudication in those who are, by nature and inclination, generally untrustworthy and dishonorable.

But our criminal justice system has always willingly accepted that risk, confident that the greater good -- the public interest -- is

23

thereby better served. Now, faced with an unpleasant consequence of the choice that society has made, the majority tailors from whole cloth a remedy for the injustice it perceives, i.e., that Brady Spicer may have been wrongly convicted. From the tapestry of that remedy, however, hangs a loose thread -- an unprecedented expansion of Brady and the unwarranted issuance of the Great Writ.

I.

At the heart of every Brady dispute lies the conduct of the prosecuting attorney. The majority bases its grant of relief in this case on the supposed neglect of Steven Sindler -- the Assistant State's Attorney for Anne Arundel County who prosecuted Spicer-- to inform Spicer's lawyer, James Salkin, that witness Larry Brown had made "inconsistent" statements concerning his contact with Spicer in the days surrounding the attack on Denvir at Armadillo's. It should be instructive, then, to examine the relevant facts from Sindler's point of view.

A.

Sometime during the summer of 1990, Sindler was contacted by Gary Christopher, an attorney in the Anne Arundel County office of the Maryland Public Defender. Christopher was interested in working out a deal for Brown, his client, who had recently been indicted on drug charges. Sindler was told that Brown "could give him the perpetrator" of the crimes committed against Denvir about six months previously. J.A. 601 (state post-conviction testimony of Gary Christopher).

Within a week or two, after Sindler had consulted with his boss to confirm the state's interest in a potential deal with Brown, he met again with Christopher, who made the following proffer:

> He said that Larry Brown had been working downtown in the downtown area in the market house shucking oysters, and that Mr. Spicer had been hanging out down there, running errands and I believe he said sleeping on the street and everything . . . . [Brown] was friendly with Brady Spicer, or

24

acquainted with him through this running of errands, and . . .
Mr. Spicer had asked him things about Armadillos . .. .
Then the incident occurred and that sometime after that inci-
dent there was conversation between the two, something to
the effect that gee, thanks for being -- that Mr. Spicer said
to Larry Brown, well, thanks for being cool or something
like that, something in -- that general type of conversation.

J.A. 847-48 (state post-conviction testimony of Steven Sindler).

Sindler "didn't really pay much attention" to the details of Christo-
pher's proffer,[1] because he wanted to talk with Brown himself before
finalizing any plea bargain: "[B]efore I would act upon anything that
a snitch would tell me, . . . I would speak to that person and know
firsthand. Generally . . . an attorney will say[only] that their client
has information." J.A. 851.[2]

B.

About a month later, Brown arrived in Sindler's office to discuss
the incident at Armadillo's directly with Sindler. Significantly, Chris-
topher was absent from this meeting. Although he had just accompa-
nied Brown to a plea proceeding in court, Christopher left his client
alone with the prosecutors after, in his words, "deliver[ing] him to
their hands." J.A. 604.[3]

_____

[1] Neither Sindler nor Christopher were sufficiently interested in the
details of the proffer to write anything down. Neither the prosecutor's
file nor that of the witness's lawyer contained any writing confirming the
contents or parameters of the proffer.

[2] Indeed, recalling his initial contact with Sindler regarding Brown,
Christopher acknowledged that he was "not sure whether I told him what
I knew at that time or whether I held back on that .. . ." J.A. 601.

[3] I am dismayed at Christopher's apparent abandonment of his client at
such a critical stage of the proceedings. Had his interview with Sindler
not borne fruit, Brown faced the prospect of twenty years in prison. More
importantly, had Christopher been present at Brown's interview, any
misunderstanding between lawyer and client concerning the extent of the
latter's involvement in the Spicer case would have been easily and
immediately rectified.

25

Brown told his story to Sindler, filling in the details of Christopher's sketchy proffer. With regard to the attack on Denvir, which occurred as Brown was shucking oysters across the street from Armadillo's, Brown said that he had seen Spicer running from the restau-

_____

Christopher's conduct following Spicer's trial is even more troubling, and is not to be encouraged. Christopher acted in a manner that was consistently disloyal to his client. To begin with, he should have been -- but was not -- present while Brown testified at Spicer's trial. Afterward, upon perceiving that Brown's testimony was "inconsistent" with his recollection of what Brown had told him (notwithstanding his advice that Brown not provide him with "all the details," see infra note 5), Christopher went directly to Spicer's attorney.

What Christopher failed to do, however, speaks much more loudly: (1) he failed to confront Brown with the supposed inconsistency, thereby giving his client an opportunity to clarify the point; (2) he failed to seek Brown's permission to disclose to others his confidential client communications; (3) he failed to make any effort to approach the prosecutor, Sindler, to clear up the issue; and (4) he failed to seek out the trial court for possible remedial steps, or to secure the court's authority to disclose his client's confidential communications.

As a result of his actions (and inactions), Christopher found himself on the witness stand seeking to contradict his client's trial testimony, accusing his client of a criminal act, and making improper disclosure of confidential client communications:

> Once an attorney-client relationship has been established and privilege has attached to confidential communications between the attorney and client, the privilege is absolute, continuing . . . to protect those communications as long as the confidentiality is preserved. Once protected by the privilege, a communication may not be the subject of compelled disclosure regardless of the need or good cause shown for such disclosure.

1 Paul R. Rice, Attorney-Client Privilege in the United States § 2:5 (2d ed. 1999); see Maryland Rules of Professional Conduct Rule 1.6(a) ("A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation . . . ."). Defendants and witnesses in criminal proceedings are entitled to greater loyalty from their lawyers -- appointed or retained -- than that demonstrated by Christopher in this case.

26

rant. Sindler "didn't think anything" of Christopher's earlier failure to mention that Brown had actually been an eyewitness, because Christopher's proffer had only been a "description of what his client might say." J.A. 851, 867 (emphasis added). As a result, Sindler "didn't think that [the statements] were contradictory." J.A. 867.**4**

Indeed, consistency -- not contradiction -- was the hallmark of Brown's account of Spicer's connection to the Denvir beating. With Sindler present, Brown repeated the same story under oath to the grand jury, and again at Spicer's trial. On the strength of all the evidence, including the testimony of Henry Connick and Sam Novella, the jury found Spicer guilty.

II.

The majority notes the applicable standard of review, ante at 10, but it bears repeating: a federal court is prohibited from granting habeas relief on any claim that was adjudicated at the state level unless the state court either (1) unreasonably determined the relevant facts or (2) unreasonably applied the law to the facts. See 28 U.S.C. § 2254(d). We must evaluate what is "reasonable" in light of all the evidence (with regard to the facts), and within the context of clear Supreme Court mandates (with regard to the law). See id.

The prosecution's failure to disclose specific evidence to the accused does not violate Brady unless the evidence is both favorable and material. Strickler v. Greene, 119 S. Ct. 1936, 1948-49 (1999). Christopher's proffer to Sindler fails to satisfy either criterion.

A.

Though evidence impeaching a prosecution witness is doubtlessly "favorable," United States v. Bagley, 473 U.S. 667, 676 (1985), impeachment with the witness's prior inconsistent statement presup-

_____

**4** Sindler explained that "[i]t wasn't relevant to me at the time [of Christopher's proffer] whether Brown would be an eyewitness . . . or not. What was relevant was that Larry Michael Brown gave me the name of Mr. Spicer." J.A. 874.

27

poses two things. First, the earlier statement must indeed be that of the witness. Second, the statement must actually be inconsistent.

The prior statement that Sindler failed to disclose was not that of his witness, Brown, but that of Brown's lawyer. Nothing that Brown testified to before the grand jury or at Spicer's trial was inconsistent with anything that he had ever said in Sindler's presence; the purported discrepancy is instead between what Brown told Sindler directly, and what Christopher represented that Brown had said earlier.

The lack of identity between the speakers is crucial to this appeal, particularly considering that Christopher's statement was given in the context of a proffer to Sindler. Proffers by counsel attempting to negotiate a plea, immunity, or other benefit for their clients are, by their very nature, unreliable for ascertaining specific facts. The following is an apt description of the proffer process:

> Through incremental steps, we get information about what the witness can tell us, and we are willing to say at each step what our reaction is to the information we have received . . . . Counsel will come in for a witness and advise us that he has a witness who is prepared to cooperate . . . . At that point, we will usually take a hypothetical proffer from the attorney that identifies general areas of subject matter, timing, sometimes specifics . . ., sometimes more general information . . . . If, at that point, the proffer is generally acceptable to the prosecutor, we will advise the attorney that if the testimony comes in along those lines, we would be interested in accepting a fuller proffer.

Robert E. Bloch, et al., Representing Corporate Employees During an Antitrust Grand Jury Investigation, 56 Antitrust L.J. 901, 920 (1988) (statement of Judy L. Whalley, Deputy Director of Operations, Antitrust Division, United States Department of Justice).

Even after defense counsel has submitted a "fuller proffer," it is virtually always the case that the prosecutor requires the witness to make a personal statement. An examination of this process makes it

28

clear that the preliminary, hypothetical representations of counsel are not considered to be those of the witness:

> There is no way that we can fully judge the candor, credibility, and cooperativeness of a witness without meeting with that witness directly . . . . In order to grant such reassurances as we can in that situation, we use proffer letters . . . . The proffer letter states that <u>during the witness interview, we will agree not to use the statements of the witness directly against the witness in the future.</u>

Id. at 920-21 (emphasis added); see also Fed. R. Crim. P. 11(e)(6) (statements made to government attorneys during the course of failed plea discussions not generally admissible against the defendant in subsequent proceedings). Obviously, if the parties to the negotiation process in any way imagined that the prior statements of counsel could potentially incriminate the client-witness, those statements would be included within the scope of the proffer letter. It therefore speaks volumes that the typical letter omits any reference to counsel's initial overtures.

It should be clear from the foregoing that proffers made by defense attorneys to prosecutors rarely encompass certainty. Most often, the proffer and negotiation process instead resembles a poker game, rife with understatement, bluff, and bluster. Lawyers for criminal defendants are understandably leery of turning up their hole cards, i.e., their clients' knowledge of other crimes, unless it is likely that they will garner a few chips in return. Most significantly, neither side contemplates that the informal proffer will ever be used by either side, or anyone else, for any purpose.

In practice, the process often does not entail even the limited structure and formality of the one described above. Many times the prosecutor and defense counsel will be familiar with each other from their past professional dealings. The attorneys may have developed a cordial relationship, and, away from the office, they may be friends. A chance encounter in the courthouse hallway can, in a matter of moments, migrate from amiable banter to discussion of a potential plea.

29

Any agreement arising out of this type of impromptu negotiation is bound to be sketchy, and may amount to nothing more than a tacit understanding to talk again later. Neither side will walk away from the meeting knowing precisely what it has bargained for, but each will be confident that it has given away little of substantive value.

Such are the realities of the modern plea negotiation process, and it was in light of these realities that the state habeas court specifically found that "Brown never made any inconsistent statement to the State regarding his being an eyewitness to the chase." J.A. 990 (Memorandum of Opinion and Order of August 9, 1996, denying Spicer's petition for post-conviction relief). This finding properly focuses on Brown's statements, and not those of Christopher in his proffer to Sindler, rendered unreliable by the context in which they were made.

The state habeas court concluded that "neither Brady nor the line of cases following Brady required the State to inform defense counsel of a potential discrepancy between what Brown's attorney indicated Brown knew and what Brown actually told the Prosecutor." Id. The state court's application of the law to the facts before it was not only "reasonable" within the meaning of § 2254(d), it was unassailable. The Supreme Court has never invoked Brady to grant habeas relief on facts remotely similar to those in this case.

In characterizing the difference between the statements of Brown and his lawyer as a "potential discrepancy," the state habeas court acknowledged the reality that negotiation is something less than an exact science. Absent Christopher's eventual testimony to the contrary, it is easy to imagine that he might have held back key pieces of information in order to gauge Sindler's response to the tidbits already on the table. Under that likely scenario, Brown and Christopher would have shared a common understanding regarding the matters to which Brown could testify. Consequently, Christopher's proffer would have been, at most, an incomplete account of the truth related to him by his client.[5] That being the case, it could not be credi-

_____

[5] The record does not indicate that Christopher at any time revealed to Sindler his belief that Brown did not witness Spicer's alleged flight, or that Sindler was ever informed that Brown had denied being an eyewit-

30

bly argued that Sindler would have any conceivable duty to disclose to Spicer or Salkin the details of the proffer.

Yet the majority holds that Sindler violated his duty in <u>this</u> case because, as it turned out, Brown's testimony did not comport with Christopher's understanding. Such Monday-morning quarterbacking unfairly makes a scapegoat of Sindler, who could quite reasonably assume that the story he was hearing from Brown was the same one that Christopher had been told, and that any variation between what Brown claimed to know and Christopher's account of the same was wholly attributable to the latter's negotiation tactics. Indeed, from Sindler's perspective, it would have made little sense for Brown to have told him more than Brown had revealed to his own lawyer.

There is simply no way that Sindler could have known of Brown's embellishment without investigating the matter further, <u>i.e.</u>, contacting Christopher for the purpose of confronting Brown. It is well-established, however, that a prosecutor's duty to the defendant does not extend so far. <u>See United States v. Walker</u>, 559 F.2d 365, 373 (5th Cir. 1977) ("While <u>Brady</u> requires the Government to tender to the defense all exculpatory evidence in its possession, it establishes no obligation on the Government to seek out such evidence."); <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975) ("<u>Brady</u> clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess.").

Without the necessary follow-up, it was impossible for Sindler to conclude that Brown's statements in his presence were in fact inconsistent with what Brown had told Christopher. Without the requisite inconsistency, Christopher's bare proffer had no impeachment value, and was therefore not "favorable" to Spicer's defense. Evidence that is not favorable to the accused need not be disclosed under <u>Brady</u>, as

_____

ness. Likewise, there is no suggestion that Christopher even once represented to Sindler that the proffer was a complete account of the evidence available from Brown. Indeed, it seems unlikely that Christopher believed that he had a full account from his client, inasmuch as he had advised Brown beforehand not to provide him with "all the details." J.A. 479.

31

the state habeas court correctly observed. The state court's interpretation of <u>Brady</u> in this case was not an "objectively unreasonable application of established [legal] principles to new facts," requiring our correction under § 2254(d). <u>Green v. French</u>, 143 F.3d 865, 870 (4th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 844 (1999).

B.

The state habeas court's irreproachable finding that the evidence of Christopher's proffer was not favorable to Spicer's defense is a sufficient basis, standing alone, to deny the relief requested in this case. For the sake of completeness, however, I will briefly address two other reasons why Spicer's <u>Brady</u> claim must fail: (1) the proffer's lack of materiality; and (2) Spicer's ready access to the evidence of Brown's supposed mendacity from a source other than Sindler.

1.

Evidence is "material" for <u>Brady</u> purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Strickler</u>, 119 S. Ct. at 1948 (quoting <u>Bagley</u>, 473 U.S. at 682) (additional citation omitted). The Supreme Court has noted that "evidence" that is inadmissible is not evidence at all, and thus cannot affect the outcome of trial. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6 (1995) (per curiam).

Christopher's proffer to Sindler was plainly inadmissible under Maryland law. <u>See Elmer v. State</u>, 724 A.2d 625, 630 (Md. 1999). <u>Elmer</u> involved the trial of two defendants for an unlawful shooting and related offenses. At issue was the prosecutor's cross-examination of one defendant who had testified that it was he, and not his co-defendant, who had fired the weapon that had injured the victim. Attempting to impeach this testimony, the prosecutor asked the witness whether he had previously asserted the opposite, <u>i.e.</u>, that his co-defendant had pulled the trigger. The basis for the prosecutor's question was a proffer by the witness's lawyer during plea negotiations, in which counsel indicated that his client would testify that the co-defendant was the triggerman.

32

The Maryland high court held that the prosecutor's attempt to get the substance of the proffer before the jury was improper, noting that "the entire area of inquiry was infused with the client/attorney privilege [and] the inadmissibility of plea bargaining discussions . . . ." Id. at 12. The import of this holding is obvious: Christopher's proffer in this case, like the proffer in Elmer, is not competent evidence. Because any testimony pertaining to Christopher's proffer was required to have been excluded from Spicer's trial, such evidence could not -- under Bartholomew -- be material within the meaning of Brady.[6] Sindler's failure to disclose the substance of the proffer was, therefore, not a constitutional violation.[7]

_____

[6] The Court in Bartholomew dismissed as "mere speculation" the reasoning of the court of appeals that the results of a polygraph test administered to a key prosecution witness, inadmissible at trial, were nonetheless subject to disclosure on the theory that the information "might have led [the defendant's] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized." Id. at 6 (emphasis added). Similarly, in this case, it would be mere speculation to posit that the disclosure of Christopher's proffer would have led counsel for Spicer to discover admissible evidence useful for impeaching Brown's credibility. As stressed by the majority, ante at 19-20, the entire case against Spicer consisted of the testimony of three eyewitnesses, including Brown. An investigation of Brown's credibility would therefore have been crucial to Spicer's defense in any event. It is difficult to see how such an important preparation would be conducted with any more care or diligence by counsel armed with the supposition that Brown intended to fabricate at least part of his testimony. Indeed, counsel had to assume that Brown was lying, insofar as his story was irreconcilable with Spicer's protestations of innocence.

[7] In its discussion of the materiality of the "impeachment evidence" that it hypothesizes would have negated Spicer's eyewitness testimony, the majority downplays the significance of the remaining evidence before the jury. Ante, at 20 ("If the jury doubted that Brown was an eyewitness, it would be left without any conclusive, or perhaps even persuasive, identification evidence"). Spicer, however, does not assert in this proceeding that the evidence was insufficient to convict him, and the majority apparently concurs in that assessment.

In my opinion, the evidence of Spicer's guilt was substantial. Even if the jury had viewed with skepticism Brown's account of the events on the day of the beating, it could yet credit Brown's testimony that Spicer

33

2.

Even if Christopher's proffer could somehow be classified as
Brady material, the law is clear that Sindler need not have disclosed
it to Salkin if it were "available to the defendant from other sources"
through Salkin's reasonable diligence. See United State v. Wilson, 901
F.2d 378, 380 (4th Cir. 1990) (quoting United States v. Davis, 787
F.2d 1501, 1505 (11th Cir. 1986)); accord, Barnes v. Thompson, 58
F.3d 971, 975 & n.4 (4th Cir. 1995).

In this case, Salkin actually spoke with Christopher prior to
Brown's appearance at Spicer's trial. J.A. 618, 641 (state post-
conviction testimony of James Salkin). Salkin testified that, during his
considerable tenure as a criminal defense lawyer, he had occasionally
questioned attorneys for adverse witnesses about specific statements
their clients had previously made, for possible use on cross-
examination. J.A. 621.

And indeed, this particular courthouse encounter began with a hint
of revelation: Christopher mentioned "in a vague way" that Salkin had
"better watch out for Larry Brown." J.A. 618. Salkin believed that
Christopher was trying to indicate to him that Brown"was a person
you had to be wary of." J.A. 621.

Revelation, however, was not to be had. Notwithstanding Christo-
pher's willingness to come forth and Salkin's own past practice,
Salkin did not inquire of Christopher as to the latter's expectations
regarding Brown's testimony. Instead, he merely attempted to have
Christopher elaborate on his rather nebulous warning:

_____

had approached him afterward to thank him for not giving his name to
those investigating the crime. Moreover, Henry Connick, the bartender
at Armadillo's, positively identified Spicer as the culprit in the attack on
Denvir; although it is true that Connick's physical description of the man
he chased did not match that of Spicer, such incongruities are not uncom-
mon among persons who have undergone the stress of witnessing a crime
from an uncomfortably short distance. Finally, Connick's identification
was bolstered by that of Sam Novella, who witnessed the chase and testi-
fied that Spicer looked "very, very familiar."

34

[Salkin]: . . . . My recollection is I asked him what's the problem, why are you sort of alerting me, and he was-- I think he told me he couldn't tell me.

Q: Did you ask him what it was that Mr. Brown was going to testify to at the trial?

A: I don't know if I asked him that question, but I thought I knew the answer.

Q: What did you think the answer was?

A: That my client was the person he had seen run out of the building and run up the street.

Q: You never --

A: And that he knew him from before.

Q: But you never asked him that.

A: No. I just asked him what -- you know, why-- you know, what is the problem or what is the real -- what is really going on.

J.A. 641-42.

Had Salkin asked Christopher a specific question regarding Brown's probable trial testimony, he would have quickly discovered that Christopher's impression was different from his own. Christopher, who "came up to [Salkin] and started talking" (J.A. 641), very likely would have been receptive to such an apparently innocuous question; as far as Christopher knew, his understanding of Brown's story comported with his client's official statement, the substance of which was already known to Salkin from the case file or otherwise.

Although the information that Salkin could have obtained from Christopher was of doubtful utility, the point is that it should have been obtained from Christopher; Sindler was not the sole available

35

source. Our precedents simply do not permit the finding of a <u>Brady</u> violation under such circumstances.

III.

The majority's grant of habeas relief in this case rests upon its conclusion that a prosecutor violated his duty to disclose to the defense that one of his witnesses made a "prior inconsistent statement" that was (1) not the witness's statement; (2) not inconsistent; (3) not admissible in any event; and (4) reasonably available from an alternate source. The majority's willingness to find a <u>Brady</u> violation on these unprecedented facts appears to stem from its concern that there is a "grave question over the fairness and accuracy" of the trial accorded Brady George Spicer. <u>Ante</u>, at 2.

The "grave question" concerning the reliability of the jury's verdict centers on the testimony of an incarcerated drug dealer who purchased his freedom at the cost of Spicer's. Brown was given the opportunity to avoid a potential twenty-year prison sentence because the Anne Arundel County prosecutors were more interested in solving a high-profile case involving the savage beating of a popular restaurateur in broad daylight.

There was nothing wrong with that decision; it is the job of prosecutors to ensure that the brunt of the state's retributive power is brought to bear on those who commit the most egregious breaches of the peace. Often, however, the only way that justice can be served is by offering sufficient inducement to a minion of the dark (but notoriously disloyal) fraternity of hoodlums and thieves to throw his brother to the wolves. Before we can punish, we must prove, and such proof is rarely within the domain of the virtuous.

Our system of justice depends on the ability of those charged with its administration to wield the occasional carrot along with the stick. In order to remove from our midst the most serious offenders, prosecutors must be given the leeway to entice lesser wrongdoers to bear witness. On occasion, the enticement proves too strong, and these witnesses lie. Others, at a later date, merely claim to have lied; these recantations, not made under oath, are quite rightly viewed with a jaundiced eye.

36

The majority knows all this, of course. Yet it tinkers dangerously with a system proven to be highly reliable, out of fear that it may not be infallible. The inevitable result of this kind of tinkering is a system that may or may not be more reliable, but also one that will surely be less efficient, and perhaps even unworkable.

The contours of the new responsibilities thrust upon prosecutors by the majority are, at best, uncertain. How should a prosecutor determine whether a witness's statement is actually "inconsistent" with an earlier proffer made by counsel? Are all potential discrepancies, regardless of their evidentiary value, now material for Brady purposes? Should prosecutors, as a prerequisite to negotiating a plea, require full written disclosure of everything to which a potential witness can testify? If so, will defense lawyers be willing to accept such a condition?

Assuredly, some lawyers will not be willing. As a result of the additional burdens on the bargaining process, it is likely that fewer pleas will be negotiated. The majority's decision will thus ensure that while our system will trap its share of minnows, hooking the bigger fish will be ever more difficult. Although it today heeds those who claim that the net was cast too broadly, the majority may well be constrained tomorrow to lament the "one that got away."

I would reverse the district court's grant of the writ of habeas corpus in this case.[8] I therefore respectfully dissent from the majority's affirmance of the same.

_____

[8] I agree with the majority's conclusion that the district court inappropriately granted relief on the alternative ground that Spicer's trial counsel was constitutionally ineffective. See ante, at 21-22.

37