UNITED STATES of America,

v.

**Shawnta Lamont WARD, Defendant.**

**No. 2:99CR22–003.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 8, 2000.

Darryl J. Mitchell, Assistant United States Attorney, Norfolk, VA, for USA.

Rodolfo Cejas, II, Norfolk, VA, for defendant.

### *OPINION AND ORDER*

REBECCA BEACH SMITH, District Judge.

This matter comes before the court on defendant's motion for a mistrial and the

granting of a new trial. For the reasons outlined below, and the reasons articulated by the court at oral argument, defendant's motion is **DENIED**.

## I. FACTS

On February 19, 1999, defendant Shawnta Lamont Ward was charged in four counts of an eight-count indictment. Ward was indicted for conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; armed bank robbery by force and intimidation, in violation of 18 U.S.C. § 2113(a) and (d); using and carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1); and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On March 3, 1999, an agreed discovery order was entered, directing the government to produce to the defendant any statements or material as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (requiring disclosure of exculpatory evidence), the Jencks Act, 18 U.S.C. § 3500 (requiring production of statements and reports of witness), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (extending *Brady* to require disclosure of impeaching evidence), for the witnesses who would testify in the government's case-in-chief.

At the time of trial, co-conspirator and government witness Dedric Sherrod had made two pre-trial statements to law enforcement authorities. The United States Attorney was, at all relevant times, aware of both statements. Sherrod's first statement ("Statement One") was given to police on December 21, 1998, immediately

following his arrest. A transcript of this tape recorded interview was given to defense counsel prior to trial and was reviewed by the court in connection with the instant motion.[1] The second "statement," and the one at issue in this motion, is an FD–302 report ("Statement Two")[2] written by FBI Special Agent Harley from notes he had taken during an April 15, 1999, interview with Sherrod. This report was never given to defense counsel during trial, and counsel was not informed by any other means of the contents of the April 15 interview.

Based, at least in part, on the testimony of co-conspirator Dedric Sherrod, a jury returned a guilty verdict on April 22, 1999, on the count of conspiracy to commit bank robbery and the count of armed bank robbery by force or intimidation.[3] The defendant was sentenced to 60 months incarceration on the conspiracy conviction and 175 months incarceration on the armed robbery conviction, with the sentences to be served concurrently. On August 9, 1999, defendant filed the instant motion for a mistrial based on the United States' failure to turn over the FD–302 report summarizing Agent Harley's April 15, 1999, interview with Dedric Sherrod, on the grounds that such failure violated his due process rights as established by *Brady*, and the agreed discovery order in this case.

Defendant had no knowledge of the FD–302 report until his sentencing hearing on July 30, 1999, during which Agent Harley, testifying for the government, stated that Sherrod had provided him information in an interview that showed that Statement One, previously disclosed to defense counsel, was false. Before he had received and read the FD–302 report, de-

---

1. In addition, the original tape recording of this statement was available to defense counsel to listen.

2. To the extent that the court uses the phrase "Statement Two," or statement, when referencing the FD–302 report, it is used only for clarification purposes to distinguish it from Statement One. An FBI FD–302 report is not

a *statement* from the witness, rather, it is a *summary* of a witness interview written *by an agent*.

3. Defendant was acquitted on the two remaining counts, using and carrying a firearm in relation to a crime of violence and being a felon in possession of a firearm.

fendant, by counsel, argued in his briefs and at oral argument that the report was inconsistent with both Statement One and the trial testimony and would have provided a basis for impeaching Sherrod's credibility, had defense counsel been aware of the inconsistent statement at the time of trial. The United States, by contrast, contended that, because the April 15 statement was consistent with the testimony Sherrod was expected to give, and did in fact give at trial, the government was under no obligation to disclose this statement to the defense, since it was neither impeaching nor exculpatory within the meaning of *Brady* and its progeny.[4]

This matter came before the court for hearing on December 1, 1999, at which the court heard argument from both parties and ordered the United States to produce the report at issue for review by defense counsel.[5] After a recess, the court gave both parties a chance for additional argument, following which the court issued a ruling from the bench. The court reserved its right to issue a written opinion, and this decision supplements the bench ruling.

## II. ANALYSIS

■ Under *Brady*, the Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (emphasis added); *see also Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Ellis*, 121 F.3d 908, 914 (4th Cir.1997); *Hoke v. Netherland*, 92 F.3d 1350, 1356 (4th Cir.), *cert. denied*, 519 U.S. 1048, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996). Evidence is mate-

---

4. Additionally, the government argues that the FD–302 report is not *Jencks* material and, therefore, it was under no alternative obligation to disclose. *See* Jencks Act, 18 U.S.C. § 3500 (1994); *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Although the thrust of defendant's argument relied on *Brady*, on brief the United States addressed *Jencks*, and at oral argument the *Jencks* standard was introduced by defendant. As such, the court briefly addresses the *Jencks* issue. An FBI FD–302 report has been held not to constitute material within the meaning of the Supreme Court's decision in *Jencks*. Although the Supreme Court held in *Jencks* that a criminal defendant has a constitutional right to inspect, for impeachment purposes, prior statements made to government agents by government witnesses, not all agent reports of an interview may be considered a statement for *Jencks* purposes. In *United States v. Roseboro*, 87 F.3d 642 (4th Cir.1996), the Fourth Circuit explained:

> While a statement need not have been written or signed by the witness, if the statement is not the witness' actual words, it must in some way have been adopted or approved by the witness to qualify as *Jencks* material. Thus, when a government agent interviews a witness and takes contemporaneous notes of the witness' responses, the notes do not become the witness' state-

ment—despite the agent's best efforts to be accurate—if the agent does not read back or the witness does not read what the agent has written.

*Roseboro*, 87 F.3d at 645 (internal citations omitted). A government agent's interview notes that "merely select[ ] portions, albeit accurately, from a lengthy oral recital do not satisfy the Jencks Act's requirement of a substantially verbatim recital." *Id.* (internal citations omitted). The court found that, failing evidence that an agent read back a report to the witness or that the witness had otherwise adopted what the agent had written, the FD–302 report was not a Jencks Act statement. *See id.* at 645–46. The question is whether the report can properly be called the witness' own words. *Id.* at 646. The statement given by Sherrod was not signed, nor was it otherwise adopted by the witness, so it clearly falls outside the scope of Jencks Act disclosure.

5. During the interim period between the sentencing and the December 1 hearing on the motion for new trial, the court ordered the government to file the FD–302 report under seal with the court and a transcript of the tape recording of Statement One. Also, the hearing on the motion for new trial was set numerous times on the court's docket, but various matters, including the need for a transcript of Sherrod's trial testimony, delayed the matter.

rial in a *Brady* inquiry "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Strickler*, 119 S.Ct. at 1947; *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555. The Supreme Court has since extended *Brady* to encompass a duty to disclose such evidence, even absent a request by the accused, *see United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and to include material relevant solely for impeachment of government witnesses. *See Bagley*, 473 U.S. at 676, 105 S.Ct. 3375; *Giglio*, 405 U.S. at 150, 92 S.Ct. 763; *Napue v. Illinois*, 360 U.S. 264, 270, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ While the prosecutor's role encompasses a "broad duty of disclosure," it also entails the conclusion that "not every violation of that duty necessarily established that the outcome was unjust." *See Strickler*, 119 S.Ct. at 1948. Last year, the Supreme Court re-articulated the three prong test that must be met in order to prove a true *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) it must be material. *See id.* The *Strickler* standard was recently cited by the Fourth Circuit in *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 555 (4th Cir.1999). In the case at bar, prong two of the test is not at issue because the Assistant United States Attorney knowingly did not produce Statement Two. The questions are whether Statement Two is exculpatory or impeaching and whether it is material.

1. *The FD–302 Report Is Not An Impeaching or Exculpatory Statement.*

■ The first question to be resolved by the court, therefore, is whether the FD–302 report was, in fact, an impeaching or exculpatory statement within the meaning of *Brady*. Since the FD–302 report provides no information on which the defense could argue exculpatory value, the only question is whether the report could be used to impeach Dedric Sherrod's trial testimony. Before the defendant saw the report, he argued that the FD–302 statement was "sufficient as impeachment material which would be favorable to the defendant." (Def.Mot. for Mistrial at 4). After reviewing the FD–302 report, counsel for defendant conceded that there seemed to be no inconsistencies between the FD–302 report and Sherrod's trial testimony. Instead, he argued with broad strokes that the government's failure to disclose a statement that was inconsistent with a produced statement, even if the withheld statement was consistent with the witness' trial testimony, constitutes a *Brady* violation. In essence, counsel argued that, armed with the knowledge that defendant had made a second statement different from the first, he would have used the inconsistencies between the two statements to impeach the witness. In support of this proposition, defendant relied on the recent Fourth Circuit decision in *Spicer*, 194 F.3d 547. However, the Fourth Circuit's decision in *Spicer* does not outline such a broad disclosure duty, and, furthermore, the facts in *Spicer* are easily distinguishable from the instant case.

In *Spicer*, the defendant was convicted of assault with intent to murder Francis Denvir in a bar and restaurant in Annapolis, Maryland. The assault took place in the upstairs office of the bar. The bartender went into the office to investigate peculiar sounds, and when he got there, he saw Denvir on the floor and left. The assailant followed and then fled the bar on foot, with the bartender giving chase for several blocks. The conviction rested *exclusively* on the testimony of three eyewitness—no physical evidence linking Spicer to the assault was offered. Larry Brown was a witness for the prosecution. Brown testified at trial that he had been working

the day of the attack at the fish market in downtown Annapolis and that Spicer ran past him while the bartender gave chase.

At trial, the bartender and another witness made very weak courtroom identifications of the defendant. The strongest identification was given by Brown. However, prior to the trial, over the course of half a dozen meetings between Brown and his attorney, during which the attorney emphasized the "need to present as much evidence ... to the state in order to interest them in working out a deal," Brown consistently told his attorney that he had not seen Spicer on the day of the attack. *Spicer*, 194 F.3d at 551. Brown's attorney then conveyed to the prosecutor what Brown had told him about his contacts with Spicer. After meeting with the prosecutor alone, without his attorney, Brown claimed to have seen Spicer on the day of the assault.

In *Spicer*, the statements at issue, Brown's denials of seeing Spicer the day of the attack, directly contradicted Brown's testimony at trial. Furthermore, the court determined the impeachment value lay in "the discrepancy between Brown's testimony in court and his prior statements to his attorney"—not the discrepancy between two out of court statements. *Spicer*, 194 F.3d at 557. In the case at bar, however, there are no material inconsistencies between the FD–302 report and Sherrod's trial testimony. Consequently, the FD–302 report had no impeachment value.[6]

### 2. *The FD–302 Report is Not Material.*

■ The touchstone of the materiality inquiry is a "concern that the suppressed evidence might have affected the outcome of the trial." *Agurs*, 427 U.S. at 104, 96 S.Ct. 2392. It is not enough for the government to have failed to disclose an exculpatory or impeaching statement. The Supreme Court recently recognized that the term *Brady* violation "is sometimes used to refer to any breach of the broad obli-

gation to disclose exculpatory evidence— that is, to any suppression of so-called '*Brady material*'—although strictly speaking there is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286. The question is not whether the defendant would have "been more likely than not to have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 1952 (*citing Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). The materiality inquiry is:

> not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* (internal citations omitted).

Defendant bases his materiality argument on the fact that Sherrod was only one of two witnesses and, as such, his credibility was essential to the prosecution's conviction. Defendant argued that he would have used the clear inconsistencies between Statement One and the FD–302 report to effectively cross-examine the witness and challenge Sherrod's testimony. However, the defendant clearly had the opportunity at trial to highlight the inconsistencies between Statement One and the facts as summarized in the FD–302 report, since Sherrod's testimony at trial was nearly identical to the FD–302 report. The court understands that defense counsel made tactical decisions at trial that included not using Sherrod's first state-

---

**6.** One need only compare the transcript of Sherrod's trial testimony and the FD–302 re-

port to easily reach this conclusion. The two are nearly identical.

ment to the police on cross-examination.[7] However, since defendant's testimony at trial was nearly identical to the FD–302 report, defendant had the opportunity to effectively challenge the inconsistencies between Sherrod's statement to the police and his trial testimony without the FD–302 report. Since the FD–302 report was basically a summary of what Sherrod testified to in court, defendant had the same opportunity to challenge defendant's inconsistent stories the day of trial by impeaching Sherrod's testimony with Statement One, just as he would have had if defendant had been able to hold up Statements One and Two and highlight inconsistencies. The disclosure of the FD–302 report would have had no tenable effect on the outcome of the trial.[8]

### III.   CONCLUSION

For the reasons stated above, and from the bench, defendant's motion for a new trial is **DENIED.** The failure to disclose the FD–302 report did not violate defendant's due process rights.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for the defendant and the Assistant United States Attorney.

**IT IS SO ORDERED.**

---

7.  Although on cross-examination defense counsel did not use the statement given to police to impeach Sherrod's trial testimony, he did highlight Sherrod's plea agreement, and Sherrod's hope that in exchange for his testimony he would "get his time cut." (Tr. of Test. of Sherrod at 36, Apr. 21, 1999). Furthermore, defense counsel tried to show that Sherrod's memory of events had been influenced by law enforcement. (Tr. of Test. of Sherrod at 36–37, Apr. 21, 1999).

8.  In point of fact, the FD–302 report may have bolstered the credibility of Sherrod at trial since his testimony was totally consistent with his interview by the FBI agent. If the defendant had impeached Sherrod, then the United States, in rebuttal, could have proffered the FD–302 report as a prior statement *consistent* with Sherrod's trial testimony.