PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ERNEST WEST BASDEN,
            *Petitioner-Appellant,*

v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
            *Respondent-Appellee.*

No. 01-24

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-97-462-5-F-HC)

Argued: January 22, 2002

Decided: May 3, 2002

Before WILKINSON, Chief Judge, and MOTZ and
GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Chief Judge Wilkinson and Judge Gregory joined.

## COUNSEL

**ARGUED:** J. Matthew Martin, MARTIN & MARTIN, P.A., Hills-
borough, North Carolina; John Dalton Loftin, LOFTIN & LOFTIN,
P.A., Hillsborough, North Carolina, for Appellant. Edwin William
Welch, Special Deputy Attorney General, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appel-

lee. **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Barry S. McNeill, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Ernest Basden of the first-degree murder of, and conspiracy to murder, Billy White, and recommended that he be sentenced to death. Basden challenged his convictions and resulting death sentence in state court, unsuccessfully pursuing direct and post-conviction relief. Basden then filed this petition in the district court for a writ of habeas corpus, *see* 28 U.S.C.A. § 2244 (West Supp. 2001), maintaining that at his trial the State withheld exculpatory evidence and knowingly presented perjured testimony, that his counsel provided ineffective assistance, and that the indictment under which he was convicted was constitutionally defective. He now appeals the district court's summary judgment denial of all habeas relief. We affirm.

### I.

The Supreme Court of North Carolina on direct appeal described the facts surrounding White's murder as follows:

> The State's evidence tended to show Sylvia White wanted to kill her husband, Billy White, for at least a year. She unsuccessfully tried to poison him with wild berries and poisonous plants. She also enlisted the help of Linwood Taylor, defendant's nephew. Taylor then approached defendant and told him he needed a hit man and asked defendant if he wanted the job. Defendant initially thought the idea was crazy and refused. Later, when defendant got into financial difficulty he asked Taylor if the offer still stood and agreed to kill White.

Taylor developed a scheme to lure White, who was an insurance salesman, to a location where he could be killed. Taylor pretended to be a wealthy businessman from out of town who had bought property in Jones County and wanted to buy insurance. Taylor arranged for White to meet him in a wooded rural area at 8:30 p.m. Sunday, 20 January 1992. On the day of the murder, Taylor and defendant drove to the designated spot and waited for White.

When White arrived, Taylor got out of his car and introduced himself to White as Tim Conners. Then Taylor said he needed to use the bathroom and stepped to the other side of the road. Defendant got out of the car and picked up a twelve-gauge shotgun he had placed on the ground beside the driver's side of the car. Defendant pointed the gun at White and pulled the trigger. The shotgun did not fire because defendant had not cocked the hammer back. Defendant then cocked the hammer and fired. White was knocked to the ground. Defendant removed the spent shell casing and loaded another shell into the shotgun. Defendant then approached White, who was lying faceup on the ground, and while standing over White, shot him again. At trial the pathologist testified that White bled to death from massive shotgun wounds to the right upper chest and left lower abdomen. Although his aorta was nearly severed from his heart, White did not die instantly but would have remained conscious for some period of time and would have felt pain.

Defendant and Taylor drove back to Taylor's house after the shooting. Taylor said he thought he left a map at the crime scene so they returned and went through White's pockets taking a blank check, wallet, and gold ring. They then returned to Taylor's house and burned all their clothing in the backyard. They also sawed the shotgun into three or four pieces with a hacksaw, put the pieces into a bucket of cement, and threw it over a bridge into the Neuse River. Taylor gave defendant three hundred dollars.

Prior to defendant's arrest, police officers retrieved two metal base portions of spent shotgun shells which were

found in ashes from the fire in Taylor's backyard. Forensic examination indicated they were consistent with twelve-gauge shotgun shells and could have been fired from the same weapon. Officers also went to defendant's repair shop in Kinston and retrieved a man's gold-tone ring with three diamond settings from defendant, who had it in his pocket.

Taylor and Sylvia White were arrested for murder on 12 February 1992. Defendant went to the Jones County Sheriff's Department where Taylor told defendant that he had confessed. Taylor advised defendant to turn himself in and talk to SBI Agent Eric Smith. Defendant was interviewed by Agent Smith and Detective Simms of the Lenoir County Sheriff's Department. After giving some preliminary background information, defendant told the officers that he shot White. The officers immediately read defendant his *Miranda* rights and defendant signed a written waiver of his rights. Defendant then gave a detailed confession and stated that he killed White because he needed the money.

Defendant presented evidence that he suffered from depression, arthritis, kidney problems, pancreatitis, and drug and alcohol abuse. He is the youngest of ten children [and thus actually a few months younger than Taylor, his much older sister's son]. He was extremely close to his mother, who was killed in a car accident when he was fourteen years old, and he never really recovered from her death. Defendant had been married once for about five years and was a good father to his stepchildren. Defendant was considered by friends and family to be a loner.

Dr. J. Don Everhart, a clinical psychologist, testified that defendant has a dependent personality disorder; he is lacking in self-confidence and clings to stronger people, performing unpleasant tasks for them to retain their support. Dr. Everhart further testified that defendant has an avoidance personality disorder; he is shy and uncomfortable in social settings and is easily isolated. Finally, defendant has a schizotypal personality disorder, with feelings of being disembodied and disassociated from life events.

*State v. Basden*, 451 S.E.2d 238, 241-42 (N.C. 1994).

The State tried Basden for capital murder, and the jury convicted him, less than fourteen months after he shot and killed Billy White. At Basden's trial, the State established the details of the crime that are outlined above, through the testimony of police officers and cross examination of Basden himself. Two officers testified to the contents of several detailed confessions, from both Basden and his co-conspirator, Taylor. Moreover, Basden himself took the stand and admitted in cross examination that he was "the one who actually shot Mr. White," that he agreed to do it the Friday before the Monday murder, and that he "did it for the money."

The jury deliberated for an hour and fifteen minutes before convicting Basden, and for nearly nine hours before issuing its sentencing recommendation. The jury found one statutory aggravating factor — the crime was committed for pecuniary gain — and two statutory mitigating factors — Basden was dominated by Taylor and under the influence of a mental or emotional disturbance. The jury also found five nonstatutory mitigating factors — repentance and remorse, willing assumption of responsibility, religious belief and practice while incarcerated, stress at the time of the crime, confession and cooperation with law enforcement at an early stage of the investigation, and character and prior conduct inconsistent with the crime. In accord with the jury's recommendation, the judge sentenced Basden to death.

Basden appealed his convictions and sentence to the Supreme Court of North Carolina and after that court affirmed the verdict and sentence, the Supreme Court of the United States denied certiorari. *See State v. Basden*, 451 S.E.2d 238, *cert. denied*, 515 U.S. 1152 (1995). Then Basden filed a motion for appropriate relief, which the state postconviction court denied in January 1996. After involved state court proceedings, Basden finally won postconviction discovery in 1999. *See State v. Basden*, 515 S.E.2d 220 (N.C. 1999); *State v. Basden*, 501 S.E.2d 920 (N.C. 1998). This discovery provided Basden with a number of documents, including police reports of additional statements from Taylor and a statement of one Tim Jones, describing facts concerning Billy White's death and the plan to kill him. On the basis of these documents, Basden filed an amended motion for appropriate relief; the state postconviction court again rejected it, and the

Supreme Court of North Carolina and Supreme Court of the United States denied review. *See Basden v. North Carolina*, 531 U.S. 982 (2000); *State v. Basden*, 544 S.E.2d 549 (N.C. 2000); *State v. Basden*, 544 S.E.2d 228 (N.C. 2000).

Basden then filed this petition for a writ of habeas corpus in federal court. The district court rejected a number of Basden's claims as procedurally defaulted, found the remaining claims meritless, and refused to grant Basden an evidentiary hearing. Basden appeals.

We conduct de novo review of a "district court's decision on a petition for writ of habeas corpus based on a state court record." *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). Applying the same standard as the district court, we can order issuance of the writ only if the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2001).

## II.

Basden raises two arguments grounded in *Brady v. Maryland*, 373 U.S. 83 (1963), which holds that a State violates a defendant's due process rights when it fails to disclose to the defendant prior to trial "evidence favorable to an accused . . . where the evidence is material." *Id.* at 87; *see also United States v. Agurs*, 427 U.S. 97 (1976). Under *Brady*, "evidence favorable to the accused" includes impeachment as well as exculpatory evidence; the suppression of such evidence is material and so violates due process "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (internal quotation marks and citation omitted).

Basden bases his *Brady* claims on documents he received through postconviction discovery in 1999, years after his conviction, sentence, and direct appeal. Ten documents fall into this category: (1) drawings

of the crime scene; (2) a report of Jimmy Britt dated February 6, 1992; (3) a report of Deputy Jernigan dated February 6, 1992; (4) a statement by Timothy Jones; (5) a report of surveillance activities involving Jones; (6) a "snitch" file containing a long list of extensive informant contacts between the police and Basden's co-conspirator Taylor, from September 19, 1991, through December 29, 1991; (7) a polygraph document and statement from Taylor dated February 12, 1992; and statements Taylor gave to police officers dated (8) June 10, 1992, (9) June 26, 1992, and (10) June 30, 1992. Basden makes no argument with respect to the first three documents; rather, he bases his *Brady* claims on the Taylor and Jones documents.

The undisclosed Taylor statements repeat much of the information contained in two other Taylor confessions that the prosecution did provide to Basden's counsel on the first morning of Basden's trial. In the suppressed statements, however, Taylor recounts additional details of his plot with Sylvia White and, in one of the nondisclosed statements, acknowledges that he lied to police about some facts in another of the nondisclosed statements. The Taylor "snitch" file reflects Taylor's extensive work for the police as a confidential informant in the months immediately prior to the murder of Billy White.

The Jones documents reveal that Jones was a police informant, who on February 10, 1992 (three weeks after the murder, but prior to the Taylor or Basden confessions), told police that six months earlier Taylor had solicited him to kill Billy White and shown him a photo of the intended victim; and that shortly after White was murdered Taylor confessed to Jones, without mentioning Basden, that he had killed White for $20,000 and a van, and detailed the entire story of luring White to his murder. (Once defense counsel received these documents, they located Jones, who further attested that Taylor had dominated Basden and that Basden was not himself at the time of White's murder in January 1992.)

The state postconviction court implicitly assumed that all of these documents were favorable to Basden — either as exculpatory evidence or for impeachment purposes — and explicitly assumed that the State had suppressed the documents. Nevertheless, the postconviction court rejected Basden's *Brady* claims, reasoning that the suppression of these documents was not "material" because Basden "has not

shown that there is a reasonable probability that either his conviction or sentence would have been different had the suppressed material been disclosed." The court relied on Basden's full pretrial confession, his full confession at trial, the testimony of police officers at his trial as to the voluntariness of Basden's pretrial confession, and the contents of the two Taylor confessions that Basden received the first day of trial. Basden argues that the state postconviction court's decision is an unreasonable application of *Brady* and its progeny, which constitute "clearly established Federal law, as determined by the Supreme Court," under 28 U.S.C.A. § 2254(d). Specifically, Basden maintains that, if the State had timely disclosed the Taylor and Jones documents, he would not have been convicted of first-degree murder, or, if convicted, would have been sentenced differently.

A.

Basden's *Brady* challenge to his conviction cannot succeed because the State presented overwhelming evidence of his guilt. Basden contends that if he had timely received the nondisclosed Taylor and Jones documents, he would never have taken the stand at his trial and confessed to the murder. Even assuming that this is so, given the State's other evidence, the documents on which Basden relies do not render clearly unreasonable the state postconviction court's confidence in his conviction.

We must reach this conclusion because none of the nondisclosed documents in any way affect the admissibility of Basden's detailed *pretrial* confession. It is undisputed that prior to his arrest Basden voluntarily sought out the police officers in order to confess to them. Although Basden states in a postconviction affidavit that he "had smoked marijuana in the morning," both police officers testified that Basden did not appear to be under the influence when he confessed, and even Basden does not say that the marijuana affected his judgment that day. Accordingly, the state postconviction court was not unreasonable in concluding that a motion to suppress the pretrial confession would have failed. *See Boggs v. Bair*, 892 F.2d 1193, 1198-99 (4th Cir. 1989) (discussing the level of intoxication necessary to render a confession involuntary).

We recognize that Basden need not show that the State offered insufficient evidence to convict him without the suppressed evidence.

*See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). But even putting aside Basden's confession at trial, when we consider his full pretrial confession, its consistency with the two Taylor confessions that the State disclosed to Basden, and the physical evidence confirming it, such as Basden's possession of Billy White's ring, we cannot conclude that the state postconviction court's ruling was unreasonable.

### B.

Basden's *Brady* challenge to his sentence raises more difficult questions. Before turning to the merits of this challenge, however, we must address a *Teague v. Lane*, 489 U.S. 288 (1989), argument advanced by the State.[1]

### 1.

The State contends that application of *Brady* to Basden's sentencing would constitute a "new rule" under *Teague*, and for this reason, in the context of sentencing, *Brady* is not "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d). *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). The clear language of *Brady* and its progeny renders this argument meritless.

In *Brady* itself, the Supreme Court expressly stated that its holding applied not only to suppression of materials at the guilt phase of a

---

[1]The State also preliminarily contends that Basden "waived" or did not preserve his appellate argument that *Brady* violations entitle him to a new sentence, because he failed to "focus[ ]" on this argument "[i]n the lower courts." The contention is meritless. Before the state postconviction court and in the district court Basden did indeed focus on his *Brady* challenge to his conviction, but in both courts he also clearly preserved his *Brady* challenge to his sentence. He moved for appropriate relief in state postconviction court seeking a "new sentencing hearing" and arguing that the suppressed documents "taken together . . . undermine confidence in the outcome of the case" and create a "reasonable probability that a different result would have been reached," and argued in his federal habeas petition that the state postconviction court "completely missed the impact of this evidence [the suppressed *Brady* documents] at the sentencing phase," requesting, *inter alia*, "a new sentencing hearing."

trial, but also at the punishment phase: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material *either to guilt or to punishment. . . .*" 373 U.S. at 87 (emphasis added); *see also United States v. Bagley*, 473 U.S. 667, 674-75 (1985) (describing *Brady*); *Spicer*, 194 F.3d at 553 n.1 (stating that in *Brady* "the Supreme Court held that a state denies a defendant due process by failing to disclose to the defendant before trial evidence favorable to the defendant that is material *either to guilt or to punishment*") (emphasis added).

Moreover, in *Strickler v. Greene*, the Supreme Court considered the effect of *Brady* materials on punishment — on a sentence. *Strickler*, 527 U.S. at 263, 291, 294, 295; *see also id.* at 307 (Souter, J., dissenting); *id.* at 280, *citing Strickler v. Pruett*, No. 97-29, 1998 WL 340420 at *10 (4th Cir. June 17, 1998) (unpublished disposition) (considering a *Brady* claim directed to a sentence). Of course, because the Supreme Court issued its opinion in *Strickler* after Basden's conviction had become final, *see Teague*, 489 U.S. at 295 (noting that the date of finality is the date of exhaustion of direct appeal), if *Strickler*'s application of *Brady* to a sentence had announced a new rule for *Teague* purposes, that rule would *not* constitute "clearly established Federal law" under § 2254(d). *See Williams*, 529 U.S. at 412. But in *Strickler*, the Supreme Court expressly stated that in applying *Brady* to sentencing, it was *not* announcing a new rule. Rather, the Court explained, "[b]ecause our opinion [in *Strickler*] does not modify *Brady*," it does not "announce a 'new rule.'" *Strickler*, 527 U.S. at 289 n.35. Consistent with this express statement, the *Strickler* Court in 1999 applied the *Brady* rule to Strickler's sentencing claim, which would have been contrary to *Teague* if *Strickler* had announced a new rule.

In sum, the Supreme Court, in first enunciating the *Brady* rule in 1963, declared that the rule applied to "favorable evidence," which is "material to guilt *or to punishment*." *Brady*, 373 U.S. at 87. Moreover, when in *Strickler* the Supreme Court itself applied the *Brady* rule to determine if nondisclosed documents were material to punishment — if they affected a sentence — the Court expressly stated that this application of *Brady* did not constitute a "new rule." *Strickler*, 527 U.S. at 289 n.35; *see also Mincey v. Head*, 206 F.3d 1106, 1139-40

(11th Cir. 2000) (considering an asserted *Brady* violation with respect to sentencing in a case final for *Teague* purposes before *Strickler* was announced); *Jackson v. Johnson*, 194 F.3d 641, 648-50 (5th Cir. 1999) (same).

We, therefore, consider Basden's *Brady* claim with respect to his sentence, examining the cumulative effect of the withheld documents, "collectively, not item by item." *See Kyles*, 514 U.S. at 436.

2.

Basden argues that with the suppressed documents,[2] he could have presented the jury at sentencing with "a powerful argument regarding the lesser culpability of Ernest Basden, with Sylvia White as the most culpable, Lynwood as her Lieutenant, and [Basden] as the mentally ill, clinically depressed, intoxicated, manipulated, rube." The state postconviction court rejected this claim, like Basden's *Brady* attack on his conviction, on the ground that Basden had not "shown that there [was] a reasonable probability" that the result "would have been different had the suppressed materials been disclosed." Basden's *Brady* sentencing contention presents a much closer question than his conviction claim, but ultimately we cannot hold, given clearly established federal law, that the state postconviction court was unreasonable in rejecting it.

At least one of the jurors, by finding that Basden was dominated by Taylor and affected by alcohol and drugs at the time of the killing, accepted a portion of the defense Basden describes — accepted, in sum, that he was an "intoxicated, manipulated, rube." Basden argues that the suppressed documents would have permitted him to fill in the other side of the picture: the leading roles and greater culpability of Sylvia White and Taylor.

---

[2]We note that *Brady* evidence need not tend to impeach a person who testified at trial or sentencing. *See, e.g.*, *Kyles*, 514 U.S. 419 (reversing two lower courts' refusal to grant the writ on the basis of exculpatory evidence including police reports that tended to impeach and incriminate a witness who never testified).

The suppressed documents do paint a picture that a jury could find supports such a theory.[3] With respect to Sylvia White, these documents show that she was obsessed with the desire to kill her husband for more than a year. Her plotting involved much more than the specific details — her requests that Taylor look for poison and find a hit man — of which the jury heard. White used various strategies to encourage Taylor to take on the murder, once threatening to commit suicide, and another time explaining "[i]t ain't that hard," and boasting that she had already smothered a child without much difficulty. White supplied Taylor with a map to the murder site, strongly suggesting that she had a significant role in selecting it. She provided him with pictures of her husband to assist in the identification. She even gave Taylor a diamond necklace, to be pawned so that he could buy a gun. *See also White*, 457 S.E.2d at 846.

The suppressed documents also show that Taylor — whose role the State sought to minimize at Basden's sentencing — entered into the murder plot with similar energy. He thought up ideas for Sylvia, suggesting that she "make it look like suicide" (which she rejected because she had already had one husband who committed suicide and another "would be too suspicious"). Taylor continually met and plotted with Sylvia White despite his purported reluctance to kill her husband. Most importantly, the suppressed documents would have shown that Taylor's determination to kill Billy White led him not only to attempt to enlist Basden several times but also to try to hire at least one other hit man. The documents reveal that after Basden initially

---

[3]Moreover, notwithstanding (or indeed perhaps because of) the greater cunning of Taylor and Sylvia White, they have been treated much more leniently than Basden. The State did not bring Taylor to trial until four years after Billy White's murder, and then permitted Taylor to plead guilty to first-degree murder; he received a sentence of life imprisonment. Similarly, the State did not seek to try Sylvia White for almost four years after the murder of her husband and then allowed her to plead guilty to conspiracy to commit murder and second-degree murder; she too received a sentence of life imprisonment. Prior to that conviction, the State tried and convicted Sylvia White for the 1973 unrelated murder of her stepson (Billy White's son and namesake) whom she suffocated with a plastic bag when he was four years old; the State did not seek the death penalty for that murder and White received a life sentence for that crime too. *See State v. White*, 457 S.E.2d 841 (N.C. 1995).

rejected Taylor's murder for hire scheme, Taylor actually tried to hire Tim Jones instead to murder White, going so far as to give Jones a photograph of Billy White.

To grant a writ of habeas corpus, however, we would have to conclude that the state postconviction court's conclusion — that Basden has not shown a reasonable probability that these materials would have yielded a different sentence — was an unreasonable application of the test for materiality under *Brady*. The problem with such a conclusion is that Basden had access to almost all of the information contained in the suppressed documents.[4]

We acknowledge that this is not uniformly the case. Rather, some information in the suppressed documents was not otherwise available to Basden's counsel. Although the two disclosed Taylor confessions reveal that Taylor "told Tim Jones everything," they say nothing more about Tim Jones. Thus, it is hard to see how defense counsel could have learned of Jones's status as an informant, or that Taylor had attempted to hire Jones to kill Billy White. Similarly, although a police officer testified before the jury that Taylor was a police informant, none of the disclosed documents reveal Taylor's near daily contacts with the police in the months immediately preceding the murder, so Basden had little opportunity to use the materials to highlight Taylor's relatively greater sophistication.

But the two disclosed Taylor confessions otherwise provide a relatively full picture of the involvement of Taylor and Sylvia White in the plot to kill Billy White. Basden, therefore, had available for his use in his defense — to make the case that he was the far less culpable "dupe" of the plotting masterminds, Taylor and Sylvia White —

---

[4]It is troubling that the State did not provide Basden with *any* of the Taylor confessions until the first morning of the Basden's trial, since the timing of a disclosure ordinarily affects the defense's ability to use it effectively. *See Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (noting that "the closer to trial the disclosure is made, the less opportunity there is for use"). In reviewing Basden's arguments on prejudice, we have considered the timing of the provision of Taylor's two statements. Even so, we cannot conclude that in this case the state postconviction court's holding constitutes an unreasonable application of *Brady*.

everything in these two confessions. The jury heard that Sylvia White originated the murder plot and, generally, that she persisted in urging Taylor to assist her for over a year. The jury heard of the many contacts between Taylor and Sylvia White and his regard for her. The jury heard that Sylvia White, with Taylor's help, attempted to kill her husband with two kinds of poison, before turning to the shooting plot. The jury heard that both Taylor and Sylvia White at various times claimed credit for developing the murder plan — Taylor posing as an insurance agent to lure Billy White to the murder site. The disclosed Taylor confessions further revealed that Sylvia White "worried [Taylor] for over a year about killing her husband," told Taylor that her first husband committed suicide, provided Taylor with a photograph of White, scouted the site of the murder with Taylor, and egged him on to do the killing by telling him that it was "easy," explaining that she had killed her stepchild. Even the prosecutor, who naturally enough minimized the roles of Sylvia White and Taylor, had to acknowledge that "the fact that his wife wanted him dead" was part of the reason why Billy White died.

In sum, Basden's counsel knew almost all of the details that were available in the asserted *Brady* materials, and were able to get most of those details before the jury. Moreover, an even more powerful argument as to the greater culpability of the other conspirators, which the *Brady* materials might have provided, would not have eliminated the core prosecution argument that Billy White died only because "somebody," i.e., Ernest Basden, "[wa]s willing to take the money." Accordingly, we cannot hold that Basden has shown that the state postconviction court was unreasonable in concluding that he failed to show a reasonable probability of a different sentence.[5]

---

[5]Basden seeks an evidentiary hearing on the prejudice at sentencing of the *Brady* materials and on his claim based on the destruction of documents, *see infra* Part V. The district court refused to grant a hearing reasoning that Basden had produced no disputes of fact at the state postconviction court or in district court requiring resolution at a hearing. Although Basden asserts that "genuine issues of material fact" necessitate a hearing on both issues, he does not discuss what such a hearing would explore. We conclude that the district court did not err in refusing to hold a hearing. *See McCarver v. Lee*, 221 F.3d 583, 597-98 (4th Cir. 2000).

### III.

Basden also contends that the State violated *Napue v. Illinois*, 360 U.S. 264 (1959), which holds that a State denies a defendant due process by knowingly offering or failing to correct false testimony. A *Napue* claim requires a showing of the falsity and materiality of testimony and the prosecutor's knowledge of its falsity. Perjury offered under these circumstances is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

Basden bases his *Napue* claim on the testimony of Special Agent Smith, who stated at trial, under oath, that he "didn't know" Tim Jones. In fact, postconviction discovery revealed not only that Agent Smith knew Jones, and knew him to be a confidential informant for the police, but also that Agent Smith had met with Jones more than once in investigating Billy White's murder.

No court has ever made a factual finding as to whether Agent Smith's testimony was false or whether the prosecutors knew it was false. (Agent Smith and the state's two prosecutors have filed affidavits stating that the court reporter transcribed the wrong name, that actually Agent Smith was asked if he knew Tim Conners — the phony name Taylor gave himself in luring Billy White to the murder scene — and that the testimony was truthful, i.e., Agent Smith did not know a Tim Conners; defense counsel, however, attest that the transcript of the trial is correct.) The state postconviction court instead assumed that Agent Smith's testimony was false and known to be false but nonetheless rejected Basden's *Napue* claim, ruling that even so the testimony was not material. The court stated three reasons for its materiality ruling: the jury did not hear the testimony, Agent Smith's credibility was not an issue at trial, and Basden confessed to the crime before trial and in court.

Basden himself recognizes that his *Napue* challenge is intertwined with his *Brady* claims; he maintains that the state postconviction court overlooked the *Brady* implications of the assertedly false testimony in assessing its materiality. Given that the jury did not hear the relevant part of Agent Smith's testimony, that testimony could *only* have affected the jury through its *Brady* implications — i.e., the falsehood

kept Basden from acquiring the asserted *Brady* materials and using them in certain ways. We have, however, concluded that the state postconviction court was not unreasonable in ruling that the State did not violate *Brady* when it failed to disclose the materials in question. Given that decision, we cannot conclude that the state postconviction court's rejection of a *Napue* claim based on nondisclosure of the same materials was unreasonable.

IV.

Basden argues that the State denied him due process by destroying evidence that might have assisted his defense. Under *Arizona v. Youngblood*, 488 U.S. 51 (1988), if a criminal defendant can show that the police failed to "preserve potentially useful evidence" with bad faith, he or she has been denied due process. *Id.* at 58. However, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

Basden bases his *Youngblood* claim on the alleged destruction of evidence that might have been useful to him, including handwritten notes of police interviews (later reduced to typing), tapes of conversations, and a map drawn by Basden himself. He argues that this destruction violated two state court orders to preserve this evidence, and that both the violation of these orders and the false testimony he alleges in his *Napue* claim show bad faith on the part of the State.

The district court ruled that Basden raised this claim on direct appeal only as a matter of state law, thus procedurally defaulting his federal constitutional claim. The state postconviction court rejected the *Youngblood* claim on the merits alone, however, supporting Basden's argument that he properly preserved it. Accordingly, we consider Basden's *Youngblood* claim on the merits under the deferential standard set forth in 28 U.S.C.A. § 2254(d).

Basden's first asserted evidence of bad faith — violation of state court orders — cannot suffice. He argues that the destruction of evidence to which he points violated state law and specific court orders. But the state postconviction court ruled to the contrary, and we have no authority to review this state-law ruling.

Nor do we find the bad faith necessary for this *Youngblood* claim in the alleged perjury at trial that was the basis of Basden's *Napue* claim. Again assuming that Agent Smith lied about his knowledge of Tim Jones, that falsity does not establish bad faith in the destruction of the largely unrelated evidence on which Basden relies. Only one of the items that Basden cites — the tape of a conversation between Jones and Taylor on February 10, 1992 — was even tangentially related to the subject of Agent Smith's assertedly false testimony. Most of the destroyed evidence was memorialized in written summaries before its destruction, and a written description of the creation of the Jones tape, in particular, survives. Finally, the state postconviction court ruled that almost all of the alleged destruction, including the destruction of the tape involving Jones, was in keeping with state law and police procedures, and Basden challenges neither these rulings nor the constitutionality of the underlying state laws and procedures. We do not see bad faith here, and we therefore have no basis on which to conclude that the state postconviction court's rejection of Basden's *Youngblood* claim was clearly erroneous.

V.

Basden argues that his trial counsel's assistance was ineffective in eleven ways, depriving him of his constitutional right to counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Cronic*, 466 U.S. 648, 658-61 (1984). Basden pursued only one of these claims on direct appeal. *Basden*, 451 S.E.2d at 244. The state postconviction court addressed and rejected one other claim on the merits, and found that the other ten were procedurally barred as well as rejecting them, too, on the merits. The district court addressed and rejected two of the claims on the merits, and ruled that the other nine were procedurally defaulted because of the state postconviction court's ruling that they were procedurally barred under North Carolina law. We begin with the claims addressed on the merits, and proceed to those deemed to have been defaulted.

A.

Basden asserts that he was denied effective assistance of counsel because of an unauthorized admission of guilt by trial counsel in his opening statement. Confronting affidavits to the contrary, the state

postconviction court ruled that "the record reflects that the defendant concurred in the decision to admit guilt to the lesser offense in the opening statement." This asserted "factual finding" does not dispose of Basden's claim, because it constitutes a pure credibility determination made without benefit of an evidentiary hearing. For a different reason, however, we cannot find that the state postconviction court's conclusion was unreasonable. We have already discussed the impact of Basden's full, voluntary, and detailed pretrial confession on the likelihood of his conviction. For the same reason, Basden cannot show prejudice under *Strickland* with respect to this claim. *Cf. Haynes v. Cain*, 272 F.3d 757 (5th Cir. 2001) (ruling that an unauthorized admission of guilt in an opening statement constituted constitutionally ineffective assistance in a case in which the defendant had never confessed).

Basden also contends that he was denied effective assistance of counsel because his trial counsel neither understood nor protected his rights under *Brady*. He bases this claim on an in-court colloquy between the court, his counsel, and the prosecutor. Basden's trial counsel had moved, in writing, for disclosure of "all . . . records and/or information which argueably [sic] could be helpful or useful to the defense." Orally, in response to this motion, the prosecutor said he did not "know of any evidence that we have that we intend to introduce that would be arguably subject to suppression." Basden's counsel did not press further.

Basden did not raise this claim on direct appeal, *see Basden*, 451 S.E.2d 238, but after postconviction discovery, the state postconviction court addressed and rejected it on the merits alone, as did the district court. Both courts rejected this claim solely by reliance on their prior rulings that no *Brady* materials were withheld.

In light of our *Brady* analysis, we agree with the state postconviction court and the district court. We further note that Basden's written *Brady* motion did ask for all *Brady* evidence. We think it clear that everyone at the hearing understood the contours of *Brady*, and that nothing turns on the prosecutor's apparently inadvertent use of the word "suppression" in responding to a later oral request. We would not permit the State to hide behind the technicalities of its response to a *Brady* request in defending a failure to disclose *Brady* materials.

*See Agurs*, 427 U.S. at 110 ("[T]here are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request."). Nor will we permit Basden to argue that his counsel's performance was constitutionally ineffective on the basis of this sort of hypertechnical argument. Basden's counsel sought *Brady* materials, and accepted the State's assurance in open court that all had been disclosed. Even if *Brady* materials existed, we see no evidence that this performance was constitutionally deficient for failure to understand or protect Basden's rights under *Brady*.

B.

Basden brings nine additional claims of ineffective assistance — for failure to move to continue the sentencing hearing, denial of the defense motion to continue the trial, failure to move to suppress the statement by Basden, waiver of venue, inadequate investigation of juror bias in voir dire, introduction of Taylor's statements, failure to explore residual doubts concerning Basden's guilt, failure to find and present mitigating evidence at sentencing, and cumulative error.

The first claim is particularly troubling. Basden's counsel apparently knew that Basden was to testify for the State at Sylvia White's trial for the murder of her stepson only a few days after his scheduled sentencing. If defense counsel had successfully moved to continue Basden's sentencing until after that testimony, Basden could have submitted an additional statutory mitigating factor to the jury. *See* N.C. Gen. Stat. § 15A-2000(f)(8) (1999). But Basden's counsel never made the necessary motion.

The state postconviction court found that on direct appeal Basden's appellate attorney "was in a position to raise" all nine of these claims (including the failure to move for continuance of the sentencing hearing), and that failure to do so meant that the claims were procedurally barred. *See* N.C. Gen. Stat. § 15A-1419(a)(3) (1999). Later, after Basden had received postconviction discovery, the state postconviction court affirmed its earlier ruling, observing that the postconviction discovery material "does not related [sic]" to these ineffective-assistance claims. Since § 15A-1419(a)(3) is an adequate and independent state-law ground, the state court's ruling on that ground means that Basden

has procedurally defaulted these remaining ineffective-assistance claims. *McCarver*, 221 F.3d at 588-89.[6]

Because Basden does not argue that his procedural default should be excused on the grounds of factual innocence or a fundamental miscarriage of justice, *see McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991); 28 U.S.C.A. § 2254(e)(2)(B), to overcome the ruling of procedural default, he must demonstrate cause for his failure to raise a claim on direct review and actual prejudice resulting from the default. *McCarver*, 221 F.3d at 588. To establish cause, Basden must make a showing of "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule," such as "a showing that the factual or legal basis for a claim was not reasonably available to counsel." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations and internal quotation marks omitted). A petitioner may not show cause by pointing to evidence that the petitioner "knew about or could have discovered" through a "reasonable investigation." *McCleskey*, 499 U.S. at 497-98.

The district court ruled that Basden had "made no attempt" to show cause for the default and prejudice. Basden points to 22 documents — all of which were assertedly unavailable on direct appeal — that, he contends, provide a factual basis for these ineffective-assistance claims.

Many of the documents on which Basden relies were, in fact, plainly available to his counsel on direct appeal. His certificate of honorable discharge and his medical history were the subject of testimony at trial and fully available to his counsel. Affidavits about events before and during trial by Basden himself, his sister Rose Clark, and his counsel on direct appeal were all available to the latter. Nor has Basden offered any reason to doubt that documents that were in his trial counsel's file or filed with the court before trial were avail-

---

[6]Basden cites a recent decision of the Supreme Court of North Carolina, *State v. Fair*, 557 S.E.2d 500, 524-25 (N.C. 2001), to argue that he did not have to raise his ineffective-assistance claims on direct appeal. When the state postconviction court ruled in Basden's case, however, *Fair* had not yet been decided, and *Fair* does not purport to describe North Carolina practice before it was issued.

able to his counsel on direct appeal. He offers expert testimony concerning events before and during trial, with no suggestion that his counsel on direct appeal could not have obtained the same opinions.

The availability of these documents means that Basden cannot show cause for his procedural default with respect to five claims: denial of his motion to continue the trial, waiver of venue, the introduction of Taylor's statements, failure to explore residual doubts concerning Basden's guilt, and failure to move to suppress Basden's confession. None of the remaining documents on which he relies to show cause, discussed below, have any relationship to these five claims, and so Basden has failed to show cause with respect to each of them.

Basden next points to affidavits by both prosecution and defense counsel in Sylvia White's trial for the murder of her stepson, describing Basden's assistance to the prosecution and the significant impact of his testimony in that case. That assistance followed his own conviction by only six days. Moreover, Basden himself certainly knew that he had assisted White's prosecutors and offers no reason why that knowledge would not have been available to his counsel on direct appeal. Because the knowledge that Basden had helped to convict Sylvia White was available to his counsel on direct appeal, Basden's claim based on his lawyers' failure to move to continue his sentencing is procedurally defaulted. Because he has pointed to no other mitigation evidence that was not available to his counsel on direct appeal, his claim based on failure to find and present mitigating circumstances is also procedurally defaulted.

Finally, Basden contends that his trial lawyers' questioning of a juror at voir dire was so inadequate that it constituted ineffective assistance. He relies on an affidavit by the juror, dated well after his direct appeal, in which the juror expresses a belief that capital punishment is appropriate for almost all killings, and on voir dire colloquies between counsel and the juror in question. The first colloquy was between the juror and the prosecutor:

> Q:  . . . [C]an you tell me how you feel about the death penalty?

A:  I think I could, if I thought a person is guilty, I would want the death penalty. If I thought they had deliberately killed someone and planned it and, I would recommend the death penalty.

Q:  Okay, so you think there are some cases that are bad enough that the death penalty ought to be used, is that right?

A:  That's right and there is some that is not.

Q:  And then others that it ought not to be.

A:  I believe that's right.

****

Q:  . . . [I]n a proper case, could you yourself vote to give somebody the death penalty?

A:  Yes, sir, I think I could.

****

Q:  . . . Let's suppose you sit on this jury and . . . find him guilty of first degree murder . . . . At that point then are you going to automatically say well, we've convict of him [sic] of premeditated murder, therefore I'm going to give him the death penalty?

A:  I don't think so.

Q:  No, you would wait until you heard the rest of the evidence, is that right?

A:  The death penalty is forever and it's permanent.

Basden's own counsel then had this exchange with the juror:

Q:  And when you get to the second trial, do you understand that you're not required to impose a death sentence

unless you yourself decide that is what you wanted to do based on weighing the evidence which is aggravating and the evidence which is mitigating and after weighing those two situations there, decide what you think is proper and the particular case that you're voting on?

A:   Right.

The state postconviction court ruled that "defense counsels [sic] questioning of [the juror] was adequate." Even if we accept that Basden has shown cause for not presenting the juror's affidavit on direct appeal, he has failed to demonstrate why this ruling by the state court was unreasonable. Accordingly, Basden's last specific claim for constitutionally ineffective assistance of counsel fails, and we therefore also reject his claim based on cumulative error.

## VI.

Finally, Basden argues that North Carolina's "short-form" indictment for murder is unconstitutional under *Jones v. United States*, 526 U.S. 227 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because it omits essential elements of the offense and aggravating factors relied upon to impose the death penalty. Previously, we have ruled that *Apprendi* and *Jones* do not apply to cases on collateral review. *See United States v. Sanders*, 247 F.3d 139, 146-51 (4th Cir. 2001); *see also Hartman v. Lee*, ___ F.3d ___, 2002 WL 340642 (4th Cir. March 5, 2002). Of course, *Sanders* binds us here, and indeed, Basden notes that he raises this claim before us only "for the purposes of preserving it."

## VII.

In sum, we cannot conclude that, given clearly established federal law, the state postconviction court was unreasonable or that the district court erred in rejecting Basden's claims. We, therefore, affirm the district court's denial of all habeas relief.

*AFFIRMED*